Lolis E. ELIE et al.

v.

C. Murray HENDERSON, individually and as Warden of the Louisiana State Penitentiary at Angola, Louisiana.

Civ. A. No. 71–310.

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

March 31, 1972.

Alvin J. Bronstein, Elie, Bronstein, Strickler & Dennis, Stanley A. Halpin, Jr., New Orleans, La., for plaintiffs.

Jack P. F. Gremillion, Atty. Gen. State of Louisiana, Baton Rouge, La., Stacey Moak, Special Counsel State of Louisiana, Baton Rouge, La., for defendants.

E. GORDON WEST, Chief Judge:

This action grows out of the alleged refusal of the Warden at Louisiana State Penitentiary to allow one of the plaintiffs, David J. Dennis, now an attorney at law, to enter the penitentiary to consult with certain inmates whom he claimed to represent. He, together with Lolis E. Elie, Alvin J. Bronstein, and George M. Strickler, Jr., members of the law firm with which he is associated, and inmates Billy Wayne Sinclair, Ora Lee Rogers, Wilbert Jones, Robert C. Coney, and Arthur Holland bring this suit pursuant to Title 42, U.S.C.A., Section 1983, and seek a declaratory judgment pursuant to Title 28, U.S.C.A., Sections 2201–2202. The case was heard by this Court on October 18, 1971, and now, after due consideration of the testimony adduced at that hearing, the Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

On August 26, 1971, Mr. Alvin J. Bronstein, one of the plaintiffs herein, directed a letter to Warden C. Murray Henderson, stating that "Mr. David J. Dennis, or a representative of the above named law firm" would be coming to the penitentiary on September 7 and 8 to talk to certain inmates who were named in the letter. The list contained the names of thirteen inmates. Then, on September 3, 1971, Mr. Bronstein sent another letter changing the date of the proposed visit to September 10, and increasing the number of inmates to be interviewed to twenty-one. On September 6 and September 9 Warden Henderson answered the two letters by sending telegrams to Mr. Bronstein stating that:

" * * * due to emotional climate and a potential volatile situation the health and safety of the prison and its employees makes it impossible for us to comply with your request at this time. We will be glad to make other arrangements for Mr. Dennis to interview these men at a later date."

Mr. Dennis responded to these telegrams on September 15, 1971, demanding to know, among other things, how his visiting "our clients" could affect emotional climate of the prison. Mr. Dennis indicated that suit would be filed if his request to see these inmates was denied. Warden Henderson replied on September 17, 1971, by suggesting that Mr. Dennis meet with Mr. Stacey Moak, Assistant Attorney General for Louisiana, in an effort to "resolve certain problems related to your request." On September 22, 1971, Mr. Moak sent a telegram to Mr. Dennis stating:

"Please be advised that I have made a thorough investigation of your request to visit certain inmates at the Louisiana State Penitentiary. Following my investigation I have concluded that you should not be permitted to enter the Louisiana State Penitentiary to interview those inmates mentioned in Mr. Bronsteins letter of September 3, 1971. I feel that your presence at the Louisiana State Penitentiary would create a situation adverse to the best interests of the inmates and free personal (sic) at the Louisiana State Penitentiary.

"Stacey Moak Special Counsel Attorney Generals Office Baton Rouge La."

This suit followed.

■■ There is no little dispute in the testimony adduced during the trial of this case. At the time of Mr. Bronstein's first letter of August 26, 1971, Mr. David J. Dennis had not been admitted to practice as an attorney at law. Hence, he personally had no "clients" and he personally was not, of course, entitled to any "attorney-client privileges" at that time. He was, however, admitted to practice on September 9, 1971, so following that date, he was, of course, entitled to all of the rights and privileges of an attorney at law. The questions presented, however, are whether or not the persons whom Mr. Dennis sought to see at the penitentiary were, in fact, bona fide clients, and whether or not he sought, in fact, to consult with them on an attorney-client basis. It must be remembered that it is the right of the client to have legal counsel if he wishes, and not necessarily the right of the attorney to counsel with those who do not seek his advice. There is much evidence in this case that those inmates whose names were listed in Mr. Bronstein's letters were not, in fact, clients of either Mr. Dennis or his associates. There is also much testimony to the effect that many of these inmates were not actually seeking legal aid but were, instead, solicited by Mrs. Dorothy Taylor, a State Representative, to send letters to these attorneys indicating a desire for legal assistance. Then also there is substantial evidence that several of those whose names were listed in Mr. Bronstein's letters were not and did not wish to be represented by these attorneys. When this became apparent during the hearing before this Court, the attorneys who are plaintiffs herein changed their tact and urged upon the Court that they had a right to interview these inmates as possible witnesses. The fact is that there was no pending litigation, and they represented to the Warden and to this Court that these inmates were their clients when they well knew that they were not. The fact is that the evidence strongly indicates that these inmates' names were given to these attorneys as "prospective clients," which, in the opinion of this Court, is solicitation at its worst. Louisiana Revised Statutes 37:213 provide, in part, that:

"No person, partnership or corporation shall solicit employment for a legal practitioner."

That same section further provides that:

"Any natural person who violates any provision of this Section shall be fined not more than one thousand dollars or imprisoned for not more than two years, or both."

There is substantial evidence in this case to indicate that that statute might well have been violated.

Of the thirteen names listed in Mr. Bronstein's letter of August 26, 1971, four indicated in their letters, filed of record, that they had contacted those lawyers at the suggestion of Mrs. Taylor, and five stated categorically that those attorneys did not represent them and that they had never sought their advice. The record is replete with evidence of the fact that many of the inmates whom the plaintiff lawyers were attempting to see were not bona fide clients and thus were persons whose right to consult with counsel was in no way being violated. An attorney simply has no constitutional right to consult with those with whom no real attorney-client relationship has been established, or with those who have not, in fact, sought their counsel. But there is a more serious problem involved here than that pertaining to whether or not these inmates, or any of them, were bona fide clients of these attorneys. That question involves the real purpose of Mr. Dennis's proposed visit to Angola on September 10, 1971. There is a strong indication in the record that the proposed interviews with the named inmates were for purposes other than legal representation. This can best be shown by reference, albeit lengthy, to certain exhibits introduced during the trial and verified and testified to by the authors of these exhibits. Exhibit D–7 is a letter dated Sunday, July 10, 1971, sent by an inmate, Robert C. Coney, to Captain Butler and Warden Dees. While this

letter, as it appears in the record, is unsigned, Coney, nevertheless, testified that he did in fact type it and send it to the addressees. It must be borne in mind that this document was written some two months before the proposed visit of Mr. Dennis to the penitentiary. It reads as follows:

"FOR: CAPTAIN BUTLER AND WARDEN DEES

"DEAR CAPT. BUTLER:

"YESTERDAY A SPECIAL MEETING WAS HELD BY THE PEOPLE WHO ARE ORGANIZED TO ATTACK THE FREE PERSONNEL THROUGH THE FEDERAL COURTS. AT THIS MEETING IT WAS DECIDED TO . . . NOT TO ATTACK YOU, MAJOR BRYAN AND WARDEN HENDERSON. THE ATTACK WILL BE CONCENTRATED AGAINST: WARDEN DEES, CAPT. DIXON, CAPT. BUNCH, LT. NORWOOD AND MR. BOBBY OLIVEAUX.

"THE ATTACK AGAINST YOU AND MAJOR BRYAN WAS DISCONTINUED AND SET ASIDE BECAUSE; THE ORGANIZATION BELIEVE THAT YOU AND MAJOR BRYAN ARE THE LESSER OF TWO EVILS. THIS IS WHAT WAS VOTED ON. WARDEN HENDERSON AND WARDEN HOYLE HAVE NEVER BEEN SERIOUSLY CONSIDERED.

"LAST NIGHT (SUNDAY) 600 + SIGNATURES WAS COLLECTED TO SUPPORT A WRIT AND OTHER ALLIGATIONS OF INCOMPETENCE AGAINST WARDEN DEES AND ALL THE OTHER OFFICERS I'VE NAMED EXCEPT YOU, WARDEN HENDERSON AND WARDEN HOYLE. THIS WRIT WILL BE NOTARIZED AND MAILED FROM THE FREE WORLD. THE NAACP IS HANDLING THE CASE IN FEDERAL COURT. THE STRATEGY IS TO GET A FEDERAL GRAND JURY OR INVESTIGATION BY THE U. S. DEPT. OF JUSTICE XXXX HERE AT ANGOLA AND OF CERTAIN FREE PERSONNEL.

"THE DATE TO KICK ALL THIS OFF IS NOT YET DECIDED ON EXACTLY. ARRANGEMENTS FOR THE NAACP, NEWSPAPERS, T.V., RADIO, MEMBERS OF THE U. S. JUSTICE DEPT. AND F. B. I. TO BE HERE IS BEING TAKEN CARE OF BY OUTSIDE PEOPLE.

"THIS THING IS PLANNED TO STOP THE PENITENTIARY FROM OPERATING ANY WORK OR ANY OTHER DUTIES UNTIL A SELECTED BOARD OF CONVICTS TALK WITH FEDERAL AND NAACP OFFICIALS ON T.V. AND RADIO. IT WAS DECIDED THAT NO ONE WOULD TALK TO ANY PRISON OFFICIALS EXCEPT WARDEN HENDERSON, AND HE MUST BE IN THE COMPANY OF THE NEWSPAPER AND T.V. PEOPLE.

"THIS THING IS WELL ORGANIZED. I'VE NEVER SEEN ANYTHING LIKE IT IN ALL MY PRISON YEARS . . . IF I'M EVER SUSPECTED I AM CERTAIN I WILL BE KILLED. THIS IS JUST HOW SERIOUS THIS THING IS. THERE ARE OVER 200 YOUNGSTERS AND A FEW OLD HEADS WHO ARE READY TO PROTECT THE LEADERS OF THIS ORGANIZATION . . . ALL OF THEM ARE TOOLED UP WITH SOME KIND OF WEAPON. I WANT TO SAY AGAIN; THIS THING IS SERIOUS AND THESE PEOPLE ARE DETERMINED. WHEN IT IS ALL OVER WITH, THEY EXPECT ONLY YOU, MAJOR BRYAN, WARDEN HOYLE WARDEN HENDERSON TO BE THE ONLY TOP LEVEL FREE PERSONNEL HERE. MOSTLY EVERYONE IS AGAINST WARDEN DEES AND CAPTAIN DIXON REAL HARD. AND MR. OLIVEAUX AND LT. NORWOOD.

"IF YOU WANT TO TALK WITH ME ABOUT THIS. THE PATROL

CAN ALWAYS PICK ME UP AND TAKE ME OVER ON THE LEVEE SOMEWHERE WHERE YOU AND WARDEN DEES WILL BE WAITING FOR ME. THIS IS JUST HOW SERIOUS AND DANGERIOUS THIS WHOLE THING IS . .

FROM    XXXXX"

This gives some indication of the "climate" at the penitentiary prior to Mr. Dennis's proposed visit of September 10. Eight days after Mr. Dennis was denied admission to the penitentiary, that is, on September 30, 1971, this same inmate, Robert C. Coney, gave a detailed statement of what was transpiring at the penitentiary and the parts that, according to him, Mrs. Taylor and Mr. Dennis were playing. This statement, identified in the record as Exhibit D–5, reads as follows:

"September 30, 1971

"TO WHOM IT MAY CONCERN

"I, Robert Coney, PMB# 71331, an inmate of the Louisiana State Penitentiary make the following statement of my own free will without threats of punishment or promise of reward.

"On or about June 1, 1971 I was approached by several inmates and asked if I was interested in starting a movement to upset things in the penitentiary. The inmates were: Gerald Clark, Tracy Lewis and Robert Matthews. This meeting took place at the New General Hospital. I was admitted to the hospital from CCR on or about this date, June 1, 1971. I met Arthur Mitchell, 66301, who was a patient in the hospital. Mitchell begin almost immediately to outline plans to me that had been drawn up by a committee of inmates who were the leaders of the group. These plans were to cause an uprising within the prison by the inmates in order to create interest from free people all over the country, expecially the New Orleans area. The plans were as followed:

"Mrs. Dorothy Taylor would be contacted and her support requested. The state and national news media along with the U. S. Department of Justice, F.B.I., NAACP and other political personnel would all know before hand about the protest and riot that was to follow.

"Hundreds of letters were written within the next week or so. These letters were sent to both State and Federal officials about conditions and free personnel at Angola. All these letters accused free personnel of brutality, corruption, murder, pay-off, and many other unjust accusations. At this time, I realized just what the whole thing was, so I made all this known to the prison authorities. I was told by the authorities to go along with things in order to help stop this riot or protest, before someone got hurt by doing all this foolishness. Warden Henderson, Warden Dees, and Captain Butler assured me that 'anytime any inmate had a problem, no matter how large or how small, they could always come to anyone of them or someone else, and help would be given.' This I personally know to be true, so I seriously decided to do all I could to help stop this thing, because it was being designed to benefit only a few leaders of the protest. And no one was serious about doing anything the right way.

"After I came from CCR (8/2/71) I met with all the so-called leaders of the group and got my first hand information from them. (Arthur Holland, L. Flannigan, E. Jackson, F. Johnson, Leotha Brown, James Jumpkins, and others whom I don't recall right now. There were about eleven (11) of us. All of us were to recruit as many people as we could depend on to support the protest and riot that was to follow. #1. No less than 150 inmates were to be armed with knives and clubs to act as enforcers. They were to be in all dormitories to see that everyone went along with all orders received from the leaders. #2.

The tag plant was to be burned down along with the sugar mill. #3. Demands were to be made that would allow the news media, Mrs. Taylor and her staff to hold a hearing with an inmate committee. If this failed, free personnel were to be taken as hostages as a last resort.

"After Mrs. Taylor's visit to Angola, I was informed by Arthur Holland that the protest had her support and help. Professional people would advise us about staying within the bounds of the law in our demands. Also advice and support would be given by the NAACP once we forced the Angola personnel into Federal Court. These plans were made by people in New Orleans who supported the prisoners. A lawyer representing these people made several visits to Angola to speak with the leaders of the protest.

"I kept the administration informed about these meetings and was told to go along because no one wanted any inmate or free personnel to get hurt or any bad feelings to develop between any inmates or prison officials. The lawyer who advised us about our rights and just how and what we were to do was Mr. Douglas Dennis. He also stated that none of us would be forgotten once this was all over with, because we are all serving long sentences. The main objective was to get rid of Warden Dees by having false stories published in the newspaper and inmates telling stories about brutalities and murders implicating him. Next Captain Dixon and Lieut. Norwood was to be attacked with the same falsehood. Corruption was to be proved by records stolen previously from different warehouses, officers and other places. All these records were turned over to Mr. Dennis and others were smuggled out. All this was a well organized plot to do two things. Improve the political position of Mrs. Taylor and for the leaders to get help in obtaining clemency once she was powerful enough to deal with state officials in high office.

"I was given the assignment to write propergander material for the newspapers and to inflame the minds of the young convicts. I wrote several articles and always passed a carbon copy on to the authorities. I received several letters from Mr. Dennis and one phone call. He told me that their entire case depended on me because I was chosen by them to appear as their material witness.

"Mr. Dennis and the law office he represents are not my attorney of record. I never requested to see or speak with them. I was approached by Mr. Dennis to support the plot and the law suit which was to follow. At all time, I was seriously concerned with exposing this infamous plot because none of the accusations are true.

"I have made this statement without any promise or threats. I expect nothing but peace of mind in exposing this plot upon the good character of many of the accused.

"All I've said is true and without any prejudice or bias.

"This 30th day of September, 1971.

> "(Signed) Robert C. Coney
> Robert C. Coney
> PMB# 71331

"Witnesses:
(Signed) Hilton Butler
(Signed) Lloyd W. Hoyle, Jr."

Also, prior to the receipt of Mr. Bronstein's letters, Warden Henderson had in his possession a transcript of testimony taken at the penitentiary on August 27, 1971, from an inmate named David L. Clark. Reference to that testimony further indicates the potential problems at the penitentiary, and the fact that both Mrs. Taylor and Mr. Dennis were apparently seriously involved in those problems. Following are some pertinent parts of that testimony:

" * * *

"Warden: I believe you wanted to tell us exactly how this recent boycott of

the kitchen and sit down strike was set up or how it was organized.

"Clark: Yes Sir, Initially a lawyer, Dave Dennis, was responsible for the organization of the entire idea. It was expressed by Mr. Dennis that in order to help Mrs. Dorothy Taylor acquire the influence and power which she was seeking, political influence and power which she was seeking, it was necessary to conduct a mass demonstration in the institution; that is, an effort to prove her allegations against the administration. Now, because of previous bucks you might say, in the past that have occurred here at Angola, they realized that if the guys would just refuse to eat and work they would not be handled by the security officers. Realizing that when inmates refuse to work this automatically causes or brings about a confrontation with the free personnel and the free personnel administration is compelled to make the inmates work because they were sentenced to Angola to work. So they are violating a rule and regulation by refusing to work. Mr. Dennis in theory felt that if the guys would go for at least seven or eight days without eating then they would have a legitimate excuse to refuse to work. He also realized that in the event that this would happen and a confrontation would occur between the free personnel and the inmates and say the inmates may have to be handled roughly to put the situation under control, then this would also help to support Mrs. Taylor's allegations that Angola administration's only form of discipline is brutality. When in actuality, this would not be the case but this was the case Mr. Dennis was trying to get the entire population to build against the administration so to speak.

"Warden: How many of you met with Mr. Dennis?

"Clark: Approximately 10.

"Warden: Who were they?

"Clark: One was Arthur Mitchell, an inmate by the name of Coney—I can't think of his full name but he goes by the nickname 'school teacher'—Louis Flannigan, an inmate guard—I can't think of his name either. He used to work over at CCE the isolation. A few others, I can't quite think of their names right now. I can recall their faces but I am not sure of their names. But the main individuals there were Louis Flannigan, Arthur Mitchell and Coney. Of course, Arthur Mitchell went back on a Court Order just before the demonstration commenced.

"*  *  *

"Hoyle: Do you know why this attorney, Mr. Dennis, was here in the first place?

"Clark: All I know, Sir, is that Arthur Mitchell has been corresponding with him for quite some time. He and Mrs. Taylor. When I came in, I recall them saying that Arthur Holland, Arthur Mitchell, Louis Flannigan and Coney, in the event that they would conduct this thing and it would end up being successful you know, they would get the proper publicity they were seeking in effort to support Mrs. Taylor in her campaign, that they would be given certain favors. They would be given aid with their legal difficulties and all these guys have a great deal of time. As a matter of fact, one has fifty years, Arthur Holland; Arthur Mitchell has something like 25 years and a parole violation; I think Coney has about 40 years and Louis Flannigan has Life. He explained to them that if they would organize and coordinate this thing that they could expect to be given help and consideration on various boards in the event that Mrs. Taylor should acquire the power she is seeking in the campaign.

"Dees: Do you think this plan was working strictly in conjunction with Mrs. Taylor?

"Clark: I am almost positive Sir. As a matter of fact, he is supposed to be her attorney, Dave Dennis is. He together with Lolis Elie are supposed to be her personal attorneys. Primarily from what was stated by him and what

was discussed by the inmates in the testimonies that were put down on tape, it is evident, that his primary reason for being up here was to organize or help the men set up a demonstration which was displayed here at Angola.

" *   *   *

"Clark: It certainly is. Well this was the purpose of the demonstration. You see, actually what they wanted that Friday was a confrontation. They wanted the security officers to come down and say beat up some guys. You know, so these guys could come back and say, Yea, I was beat up man, this was a peaceful demonstration and the free people beat me up with baseball bats and so forth. This is what they wanted. They tried to provoke this, the inmates did because in the event that this would have happened the administration would have played into the hands of Mrs. Dorothy Taylor and her lawyer. You know, the inmates tried in every means they could to provoke this thing. Even back in CCE as a matter of fact, I stayed back there a couple of days and a situation occurred when an inmate provoked a free man to the point where he had to be handled. He cursed a free man and called him a lot of different names, he insulted him in every way he knew how. In every way humanly possible he insulted him and this went on for a couple of days. Until once it occurred when a free man went back to his cell and asked him to come out. He refused to come out. He refused a direct order so therefore according to the rules and regulations of this prison he had to be handled. OK. The free man sent the guard in to get him. He tried to resist so they had to do the next best thing they could because this was provoked by the inmate and he was in penitentiary terminology "roboted" by the other inmates and had to do this. There are certain inmates in the penitentiary who have this free man's badge number and they intend to relate this incident to Mrs.

Taylor when she comes. But of course, they are going to distort the truth. They are not going to tell it as it actually was.

" *   *   *

"Warden: Clark, how was this thing organized on the dormitories? By this I mean, did you have a man for each dormitory, each camp and did you have an alternate in case that the original man didn't show up? Or didn't work out?

"Clark: Well, see, how it all began, the outcamp representatives came up after Coney and Louis Flannigan were interviewed by you Sir. They felt that they were on the spot you know, so in an effort to preclude being locked up or placed into the cell block isolated from the population, they got all the inmates like myself, a few other guys, to come along you know to meet with you in an effort to prove or to show you that it was not just the idea like it was a bunch of guys' idea. Like it didn't just originate in their minds, like it was the idea of the entire population or something. So these guys that were selected, I mean you have—at least to protect or put security around the demonstration to inform their dormitories to select in the event that they would be placed in isolation or something for their activities, to select new representatives for the purpose of keeping each other informed on what was going on. In the event, see, that one dormitory wanted to know what the outcamps were doing well, just these men could meet, you know, and not to believe anybody but a representative you know. His job was also to put things on paper. They were instructed not to believe anything unless it was put on paper. You know, all the representatives had this information also. Anything they wanted to relate to the main prison or to an outcamp, it would be typed out, run off somewhere in the education department, then sent to an outcamp.

"Hoyle: Was this organization type thing in any way influenced by this attorney you mentioned? Did he instruct them any way how to organize this demonstration?

"Clark: Yes Sir, he did. He did Sir. While present we were discussing about the various bucks that had taken place at the institution in the past and about why they failed. You know, what were the weak points and so forth. Arthur Mitchell and Mr. Dennis were more or less debating on this between themselves. They were debating it. Arthur has had previous experience and he stated what these type of bucks in the institution—he is a second or third timer—and he explained to Mr. Dennis that usually when something like this starts, they always get the leaders, you know, get the leaders and everybody else just blow it off because there is nobody to inform them what to do or to keep their spirit—you know, to keep their spirit up to par. So he came up with the suggestion that in the event that the main guys responsible for this something would happen to them to arrange it whereas other guys would be able to carry the thing on and would be informed or could be informed as to what to do. More or less, the pamphlets that were put out were more or less keeping the guys with the main idea. This was the thing because on the pamphlet it stated that the demonstration was not to cease until that Friday, the day after, which was Friday the 13th of August. It would not cease until that Friday the 13th when they would cease to work and from then on they would refuse to work you know until Mrs. Dorothy Taylor, Senator O'Keefe or the Governor would come to the institution and talk to some of the guys. So it was more or less that everybody was programmed in that direction. Like, whatever new representatives were selected well they already knew that the main idea was to stick to the initial plan and their job was to keep everybody informed that that dormitory was still going along with the idea that there were no changes so everybody would be kept up abreast of what was going on in each dormitory, in each unit and each out camp.

" *  *  *."

There is little doubt from the testimony in this case that the proposed visit of Mr. Dennis to the penitentiary was not designed to further a legitimate attorney-client relationship. Both Mr. Bronstein and Mr. Dennis testified that the primary purpose of the visit was "to investigate conditions at the penitentiary." They both admitted that they had never represented any of those inmates listed in Mr. Bronstein's letters prior to Mr. Dennis's attempted visit to the penitentiary. During Mr. Dennis's prior visit to the penitentiary he asked various inmates, who had not requested to see him, if they would agree to become parties to a law suit that might be filed. This is solicitation, purely and simply, and does not involve a legitimate attorney-client relationship. For example, inmate Morris Johnson testified that he had an attorney of his own, but that Mr. Dennis came to see him. Wilbert Smith, another inmate, says he did not sign the letter to Mr. Dennis as indicated and that he never wrote to any of these attorneys. Inmate Donald Buffett testified that he received two or three letters from these attorneys but that he had never asked to see them. He said that he "didn't need no lawyer." Inmate Eron Moss testified that his name was listed in Mr. Bronstein's letter but that he never requested nor wanted them to represent him. As previously set forth herein, David Clark testified that he attended the meeting when Mr. Dennis came to the penitentiary and at that time a "protest demonstration" was discussed. He testified that the purpose of the meeting was to organize and plan a protest demonstration.

It is interesting to note that following a prior visit of Mrs. Taylor to the penitentiary, a demonstration that resulted in approximately $10,000 damage to pen-

itentiary property was staged. The ring leaders of this demonstration were inmates who had previously met with Mrs. Taylor. Also, following a prior visit of Mr. Dennis to the penitentiary, a hunger strike and a no-work strike ensued led by inmates who had met with Mr. Dennis.

Warden Henderson testified that in view of the information he had obtained from inmates, and in view of the prior disturbances at the penitentiary following visits of Mrs. Taylor and Mr. Dennis, he believed that another visit at that time by Mr. Dennis would dangerously inflame the prison inmates. It was obvious to him from information given to him by inmates, that the purpose of Mr. Dennis's visit was to counsel with the inmates concerning a proposed protest and demonstration rather than about legitimate legal problems. Warden Henderson made it clear during his testimony that the action taken by him pertained only to Mr. David Dennis, and not to other members of the firm with which he was associated. At that time, and at the time of this trial, Warden Henderson stated that he had no reason to deny the other members of the firm access to the penitentiary. But he felt that he had more than ample reason to deny Mr. Dennis access to the penitentiary at that time. His refusal to allow Mr. Dennis to come to the penitentiary was based upon his knowledge of Mr. Dennis's prior activities at the penitentiary. Intensive investigation by prison authorities convinced them that Mr. Dennis did not intend to visit inmates in a normal attorney-client relationship but rather as an instigator of a proposed protest and possible riot at the penitentiary. The evidence in this case supports that conclusion.

CONCLUSIONS OF LAW

■ While as a general principle of law, every person, including an inmate in a penitentiary, has a right, at reasonable times, to consult with his attorney, this right is, nevertheless, not so absolute as to be immune from reasonable restrictions.

"While opportunity to consult counsel must be preserved, it is clear that an inmate in a penal institution is not to be allowed untrammelled intercourse with the outside world, and that the rights of his attorney to that extent are similarly limited." Laughlin v. Cummings, et al., 105 F.2d 71 (C.A. D.C.1939)

The Court in Laughlin concluded that there was no showing in that case that the "rights of the inmate to have legal representation, or the rights of appellant to serve as his counsel and to confer with him at reasonable times have been in any manner wrongfully curbed by the acts of the appellees." The same observation must be made in the instant case.

■■ In line with the principles set forth in Laughlin, while an inmate may not unreasonably be denied the right to consult with counsel of his choice, the prison authorities may, nevertheless, establish such reasonable safeguards as they, in their opinion, may deem necessary for the safety of the institution and its prisoner and free population. The burden must be, of course, upon the prison authorities to show that any restrictions placed upon that right are reasonable, necessary, and that they do not unduly restrict the right in light of existing circumstances. It is the opinion of this Court that the defendant herein has carried that burden. The right of inmates at Louisiana State Penitentiary to consult with counsel was not, in this case, unduly or unreasonably restricted. The only attorney denied admission to the penitentiary by the defendant was Mr. David Dennis, and there was overwhelming evidence in the hands of the defendant to warrant the conclusion that this particular attorney, at that particular time, did not seek to visit bona fide clients in a legitimate attorney-client relationship. By Mr. Dennis's own admission in Court, most of these inmates he sought to visit were not and never had been clients despite his prior representation to the Warden and to this Court

that they were. There is no evidence that the other attorneys who are plaintiffs in this suit were denied admission to the penitentiary, and there is no evidence that the named inmate plaintiffs requested to see these attorneys. The request for the visit came on behalf of Mr. Dennis and not on behalf of clients. Thus it is the conclusion of this Court that none of the plaintiffs are entitled, at this time, to the relief which they seek, and their claims will therefore be denied.

■ If, in the future, inmates request that these attorneys be permitted to visit them, such a request should, of course, be honored by the prison authorities unless there is justifiable grounds for not doing so. The prison authorities would, in such a case, have a heavy burden of proof. But nothing said herein shall be deemed to mean that reasonable conditions could not be attached to an attorney's right to consult with prison inmates. For instance, it would not seem unreasonable for the attorney to be required to meet with bona fide clients, one at a time, instead of as a group; it would not seem to be unreasonable for the prison authorities to require that they be furnished evidence from the inmate himself of the fact that the inmate was requesting the visit from his attorney. It would not seem to be unreasonable, under certain conditions, for the attorney-client consultation to be held at some place other than at the penitentiary if the prison officials thought that necessary to protect the welfare of the institution and its inhabitants. Each case must stand on its own bottom when trying to determine the reasonableness of such restrictions if indeed they are imposed. Whenever possible, access as complete as possible should be given an inmate to his attorney. Any restrictions placed thereon must be reasonable and justified under the existing circumstances. The restrictions imposed in this case were both reasonable and justified under the circumstances of this case.

For these reasons, judgment will be entered denying the relief sought by the plaintiffs and this suit will be dismissed at plaintiffs' cost.