Fred Arispe CRUZ et al., Plaintiffs-Appellees, Cross-Appellants,

v.

Dr. George BETO and W. J. Estelle, Jr., Director, Texas Department of Corrections, Defendants-Appellants, Cross-Appellees.

No. 77–1641.

United States Court of Appeals, Fifth Circuit.

Oct. 5, 1979.

Rehearing Denied Nov. 7, 1979.

John Pierce Griffin, Asst. Atty. Gen., Nancy M. Simonson, Austin, Tex., for plaintiffs-appellees, cross appellants.

William Bennett Turner, Ann V. Brick, San Francisco, Cal., for defendants-appellants, cross appellees.

Before WISDOM, CLARK and GEE, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The plaintiffs, 12 prisoners of the Texas Department of Corrections (TDC) and their attorney Frances T. Jalet Cruz, instituted this civil rights action against George J. Beto, former Director of the TDC,[1] pursuant to 42 U.S.C.A. § 1983. The district court found that defendant had unlawfully interfered with plaintiffs' attorney-client relationship, entered an injunction against further violations, and, upon a finding of bad faith overcoming Beto's qualified immunity, awarded money damages and attorney's fees against defendant. Beto claims that the imposition of an erroneous burden of proof wrongfully deprived him of the full benefit of his immunity and appeals the award of attorney's fees. All parties challenge the amount of damages awarded. We affirm.

This case arises from the response of defendant Beto, in his capacity as Director of TDC, to the professional activities of the plaintiff attorney Frances Cruz as the legal representative of many TDC inmates, including her co-plaintiffs. Cruz, an attorney with extensive legal background and experience in poverty law and related areas, provided TDC prisoners with legal advice and representation in suits seeking post-conviction relief as well as suits challenging the constitutionality of various prison practices and conditions.

Late in 1971, although Cruz had never violated any TDC visiting or correspondence regulations, defendant Beto summarily denied her further admission to the institutions under his supervision and terminated correspondence between her and any TDC inmate. His letter informing her of this sanction claimed that her activities aroused the animosity of the TDC inmate population and spurred the filing of federal civil rights lawsuits by inmates thereby interfering with the tranquility of TDC. Prior to this extreme action, however, no complaint had ever been made that Cruz had committed any illegal or improper act or that she had participated in any unethical behavior.

Three weeks after barring Cruz's access to her clients, Beto was persuaded to retract his order, but only to the extent that communication was restored between Cruz and 27 named inmates, including the prisoner-plaintiffs, listed as her clients prior to the ban. The modified order was intended as a phase-out program permitting Cruz to work on pending matters while preventing her from filing any new litigation. She was not permitted to visit or correspond with prisoners other than the 27 listed. Letters of other inmates seeking her legal assistance were returned undelivered.

Those of the listed 27 prisoners who wished to remain clients of Cruz were immediately transferred to a separate wing of the Wynne Unit of the TDC, and became known as the Eight Hoe Squad. They were worked as a separate unit and were not permitted to eat, socialize or communicate with the general inmate population. Their living conditions were unusually and discriminatorily harsh—the numbers of inmates per room were doubled, access to commissary privileges was reduced, disciplinary actions and searches became more frequent. Severe restrictions on their participation in recreational, educational and rehabilitative programs limited their opportunities to earn merit points toward parole in the Point Incentive Program (PIP), and there was evidence to suggest that PIP points were discriminatorily withheld, preventing those in the Eight Hoe Squad from

---

1. W. J. Estelle, Jr., who succeeded Beto as Director of TDC, was joined as a defendant. However, the district court found that although Estelle continued the enforcement of the challenged policy of defendant Beto when he first assumed the directorship, he terminated the policy within two months. The court concluded that

the evidence does not refute the conclusion this his actions were taken in good faith at that time. While the proof presented demonstrates no need for the policy to have been continued for 45 days after defendant Estelle took office, . . . neither does the proof demonstrate that defendant Estelle behaved in such a manner to become ineligible for a qualified immunity.

The court's disposition of the action against defendant Estelle has not been appealed.

maintaining a high rating or remaining eligible for privileges and "good time" credit towards parole. Certain of the inmate-plaintiffs had complaints of specific individual deprivations such as elimination from continuing participation in academic degree programs or forced manual labor more strenuous than that permissible under their medical classification. Release from the Eight Hoe Squad was conditioned upon relinquishment of Cruz's representation.

The district court found that no other attorney had ever before been barred from or so restricted in working with TDC prisoners. It further found that

> Because they were deprived of or penalized for accepting Mrs. Cruz's pro bono legal assistance and being generally poorly educated, they were unable to obtain adequate legal assistance. Yet they were in need of such assistance on various legal problems affecting both their convictions and sentences and their claims of violations of federal constitutional rights as prisoners.

The Eight Hoe Squad prisoners were regularly pressured to abandon legal representation by Cruz. Three of the prisoners agreed to terminate their attorney-client relationship with her and were immediately returned to the general prison community with a corresponding improvement in their status as prisoners. For example, one became a dental assistant and another a building tender. The segregation of the Eight Hoe Squad continued until two months after Beto was replaced as Director of TDC, for a total of 356 days. Twelve of the Eight Hoe Squad inmates are co-plaintiffs in this action.

The district court concluded that the prisoners' first and fourteenth amendment rights had been violated by the unreasonable limitations on their right of access to the courts, their right to receive effective legal assistance from the attorney of their choice, and their right to equal protection of the laws and to due process of law by subjecting them to discriminatory treatment and deprivation of normal prison privileges as a consequence of their remaining clients of plaintiff Cruz. Furthermore, it found that the arbitrary barring of attorney Cruz from communicating with her clients contravened her first and fourteenth amendment rights to practice her profession.

Beto does not deny taking or ordering his staff to take these actions but asserts they were justified by reports which led him to believe that Cruz's activities were inflaming unsettled prison conditions at the TDC in 1971 and were the catalyst for a plan of group action, purportedly designed by the prisoner-plaintiffs, to endanger other inmates or overturn the prison administration. However, the district court found that neither Cruz nor her clients did anything to provoke the actions taken against them. To the contrary, it concluded:

> The evidence conclusively points to the fact that the prisoner-plaintiffs were segregated not because they were violence-prone but because they wished to have Mrs. Cruz represent them.

In its order awarding money damages against Beto for these violations, the court found that the Director of TDC did not enjoy an absolute immunity from liability but was entitled only to a qualified immunity by virtue of his position as a state prison official. To be eligible for this qualified immunity, the court stated:

> defendants must demonstrate that they have acted within the scope of a discretionary function and that they have acted reasonably and in good faith . . .
> That is, they must demonstrate that on an objective basis, their actions were reasonable under the circumstances; and that on a subjective basis, they acted in good faith under the circumstances.

On the basis of the facts before it, the court then concluded:

> The evidence in this case conclusively demonstrates that defendant Beto's actions were not reasonable under the circumstances and were not taken in good faith.

Thus Beto was held liable in damages to Cruz for $1,000 and to the prisoner-plaintiffs for an aggregate of $9,291.00.

■ There is no doubt that Beto's actions against plaintiffs were taken in his official capacity as a prison official. Although at the time of this trial the qualified immunity defense had not yet been established in such cases, it is now settled that Beto's exposure to liability for damages under section 1983 is limited by the qualified immunity set forth in *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). The Supreme Court in *Procunier* accorded to prison officials the same qualified immunity defense previously accorded a state governor, a university president, and national guard members in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and school board members in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). *See also O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (superintendent of a state hospital); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (policemen).

In *Scheuer* state officials who were sued under section 1983 for their involvement in shootings at Kent State University sought an absolute executive immunity from liability for damages. The Supreme Court recognized that common law tradition supported a degree of protection for government officials performing their duties. It noted that historically official immunity rested on "two mutually dependent rationales." First, "the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion;" and second, "the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good." 416 U.S. at 240, 94 S.Ct. at 1688. The Court emphasized that immunity encouraged unhindered, prompt decision-making by those who govern and protect the public:

> Public officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully

and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all.

416 U.S. at 241–42, 94 S.Ct. at 1689 (footnote omitted). *See Barr v. Matteo*, 360 U.S. 564, 572–73, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 40 L.Ed. 780 (1896).

Against these considerations, the Court balanced the need declared by Congress in section 1983 to protect the public against individual deprivations of constitutional rights by an official's abuse of his position. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Thus, rather than granting officers of the executive branch of government an absolute immunity for their actions, the Court recognized in them a qualified immunity "in varying scope . . . the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based." 416 U.S. at 247, 94 S.Ct. at 1692.

*Wood v. Strickland, supra,* accorded a similar immunity to school board members based on "common law traditions" and "the obvious need to avoid discouraging effective official action by public officers charged with a considerable range of responsibility and discretion, only if they acted in good faith." 420 U.S. at 317–18, 95 S.Ct. at 998–99. Finding that the full protection of an absolute immunity would unnecessarily limit the remedies of persons subjected to "intentional or otherwise inexcusable deprivations" without furthering the policy of unhampered performance of obligations, the court found that the necessary degree of immunity

> must be such that public school officials understand that action taken in the good-faith fulfillment of their responsibilities

and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity.

420 U.S. at 321, 95 S.Ct. at 1000.

■ Following these precedents, the Supreme Court in *Procunier v. Navarette, supra,* held that prison officials were entitled to the same qualified immunity defense against section 1983 damage actions. *See Bogard v. Cook,* 586 F.2d 399 (5th Cir. 1978). As developed through *Scheuer, Wood,* and *Procunier,* the immunity consists of both a subjective and an objective component. Under the first part, persons clothed with this qualified shield lose its protection

> if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right and if they knew or should have known that their conduct violated the constitutional norm.

434 U.S. at 562, 98 S.Ct. at 860. Secondly, whatever the objective state of the law at the time of the actions, "an official forfeits his immunity [if] his subjective intent was to harm the plaintiff." *Bogard v. Cook, supra,* 586 F.2d at 411. *See Bryan v. Jones,* 530 F.2d 1210 (5th Cir.) (en banc), *cert. denied,* 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976).

■ *Procunier* and its progeny had not yet been decided at the time of Beto's trial or when the briefs were first submitted on this appeal. Although Beto originally argued that his immunity was absolute, he now concedes that the recent case law governs. However, he now asserts that having established his qualified immunity by virtue of asserting that his questioned decisions were made as director of the prison based on what he perceived to be a security need of the institution, the plaintiffs have the burden of piercing his immunity by pleading and proving that he has abused his authority either subjectively or objectively as the standards have been stated. We agree.

■ The underlying policy which pervades every qualified immunity analysis is one of protecting the public by permitting its decision-makers to function without fear that an exercise of discretion might in retrospect be found to be error. *See Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). If an official can show that questionable actions were taken in the regular course of discharging his official duties, therefore, this policy affords him immunity from liability. To deny him qualified immunity protection unless he goes further and demonstrates that his actions were above the benchmark of legal good faith, would make the concept of qualified immunity a meaningless embellishment.

Qualified immunity had its origin in the common law. *Scheuer v. Rhodes, supra; Pierson v. Ray, supra.* At common law, a police officer charged with false imprisonment had the burden of pleading and proving that he acted in good faith if he was to avoid liability. *Dellums v. Powell,* 184 U.S. App.D.C. 275, 566 F.2d 167 (D.C.Cir. 1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 456 F.2d 1339 (2d Cir. 1972), on remand from 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Restatement (Second) of Torts §§ 121, 127 (1965); 1 Harper & James, The Law of Torts § 3.18 at 277 (1965). Some courts have extended this common law burden of proof rule from false imprisonment cases involving policemen to situations relating to higher executive officials. *Dellums v. Powell, supra; United States v. Sielaff,* 564 F.2d 153 (3d Cir. 1977); *Skehan v. Bloomsburg State College,* 538 F.2d 53 (3d Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976); *McCray v. Burrell,* 516 F.2d 357 (4th Cir. 1975). Other courts, to the contrary, have imposed on the plaintiffs the burden of overcoming the defense of qualified immunity by a showing of lack of good faith. *Hendricks v. Havener,* 587 F.2d 21 (8th Cir. 1978); *Kostka v. Hogg,* 560 F.2d 37 (1st Cir. 1977); *Stadium Films, Inc. v. Baillargeon,* 542 F.2d 577 (1st Cir. 1976); *Gaffney v.*

*Silk,* 488 F.2d 1248 (1st Cir. 1973). In *Bogard v. Cook, supra,* we held it to be the plaintiff's burden to establish that the defendant official, who claimed a qualified immunity, acted recklessly or in a grossly negligent manner.

In *Newman v. State of Alabama,* 559 F.2d 283 (5th Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978), this court noted the difficulties inherent in the operation of today's prisons:

> State penitentiaries are occupied by convicted felons, either ineligible for or found to be unworthy of probation. By its very nature, the operation of such a prison is a dangerous undertaking. Time and time again, experience has dramatically taught that the management and control of prisons, the prevention of mass violence within prisons, and the safe retention of convicts within prison walls, present problems of the first magnitude, in which failures occur all too often.

559 F.2d at 287. Officials responsible for prison administration have a broad range of duties and authority and must be able to react quickly and authoritatively to everyday occurrences. Their responsibilities are far broader and require greater exercises of discretion than police officers. Accordingly, if the doctrine of qualified immunity is to have a real meaning, some distinction must be drawn between the defense accorded the policeman in a suit for false imprisonment at common law and the director of a statewide prison system in an action to impose damages based on his exercise of executive management discretion.[2]

Beto argues that the district court wrongfully imposed the burden on him to prove that his actions were taken in good faith. This error he claims requires reversal. Although the language of the district court might be construed to impose such a

burden on defendant, it obviously did not control the court's conclusions in this case. Despite frequent statements that "defendants have failed to demonstrate" good faith, the court also said "Plaintiffs have demonstrated that Mrs. Cruz's conduct in no way justified the sanctions imposed upon her by defendants." Finally, it concluded that

> [T]he evidence demonstrates that defendant Beto instituted reprisals against Mrs. Cruz and, by association, those prisoners including the prisoner-plaintiffs who were her clients, for reasons totally unrelated to considerations of proper prison administration. Such actions were taken in violation of Mrs. Cruz's constitutional rights. Defendant Beto did not act with good purpose and with a belief that he was doing right.

■ We are persuaded that even if the court initially placed an improper burden on the defendant of going further than pleading and proving that he acted as director and that his actions were taken in furtherance of what he perceived to be his official duty, the court did not base its ruling on the officer's failure to prove good faith but concluded that plaintiffs' evidence affirmatively showed bad faith. Indeed, the court made an independent finding of bad faith in its award of attorney's fees to plaintiffs under the American Rule. In its separate memorandum and order filed before passage of the Attorneys' Fees Awards Act, 42 U.S.C.A. § 1988, the court referred to its earlier findings of bad faith supporting money damages against Beto. Clearly, here the burden of proof was placed on and borne by plaintiffs.

■ Furthermore, Beto could show no prejudice from an erroneous imposition of the burden on him to show good faith.

---

2. Requiring the plaintiff to demonstrate an abuse of office is consistent with the requirements for a prima facie section 1983 suit alleging inadequate medical treatment. In such cases, inadequate medical care has been held not to constitute cruel and unusual punishment cognizable under section 1983 unless the mistreatment rose to the level of "deliberate indifference to serious medical needs." *Estelle v.*

*Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). In order to recover under this theory, this circuit has required the plaintiff to establish that any mistreatment was deliberate. *Fielder v. Bosshard,* 590 F.2d 105 (5th Cir. 1979); *Dickson v. Colman,* 569 F.2d 1310 (5th Cir.), *cert. denied,* 439 U.S. 897, 99 S.Ct. 259, 58 L.Ed.2d 244 (1978).

Defendant concedes that at the time of trial the state of the law was such that he arguably had no immunity, and that he therefore had every incentive to advance his best case. To reverse and remand for a new trial based on the semantics in a few sentences of the opinion thus would not accord to defendant any opportunity to supply proof he thought was denied by a mistaken assignment of burdens.

■ Beto also argues that, even if the correct burden was applied, the evidence does not show that plaintiffs satisfied either of the dual requirements of *Procunier v. Navarette.* He urges first that the constitutional rights allegedly infringed were not clearly established at the time of his challenged conduct, relying on case authority supporting the propositions (1) that inmates do not have an absolute right to the legal assistance of a particular attorney and (2) that attorneys do not have an unlimited right to enter prison facilities. While it is true that prison officials may restrict attorney-client contacts through the enforcement of reasonable administrative rules and regulations for the maintenance of prison security, discipline, and order, this is not such a case. Prison officials have a broad discretion in governing prisoners entrusted to their care. This power may include in appropriate cases the banning of disruptive attorneys and the classification of prisoners. *Davis v. United States,* 455 F.2d 919 (5th Cir. 1972), *aff'd,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973); *Elie v. Henderson,* 340 F.Supp. 958 (E.D.La.1972). However, not even the broadest discretion may be used to punish prisoners for the exercise of their constitutional rights to counsel and to gain access to the courts. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The district court found that the actions of the plaintiff-attorney which defendant Beto considered a threat to prison security consisted of nothing more than her attempts to seek redress in the courts on behalf of her clients. Such access to the courts was recognized as a protected constitutional right of prisoners long before Beto instituted the sanctions here. *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); *Andrade v. Hauck,* 452 F.2d 1071 (5th Cir. 1971).

■ We need not rely on this reasoning, however, since the district court's finding of bad faith alone suffices to strip defendant of his protective immunity whatever the objective state of the law might have been at the time. *Bogard v. Cook, supra,* 586 F.2d 399. Beto urges that his actions were a justifiable response to his reasonable belief that Cruz's primary purpose in entering the institution was to create dissension by encouraging inmates to file frivolous suits and urging the commission of violent acts. The court found to the contrary:

> The evidence conclusively demonstrates that: Mrs. Cruz engaged in no efforts to disrupt prison security and violated no prison regulations; the prisoner-plaintiffs operated no plan of group action, such as a communications network, designed to endanger other inmates or overturn the prison administration; defendant Beto's actions were prompted by his long-standing antagonism towards Mrs. Cruz's contact with TDC inmates; and they were taken primarily to discourage the prisoner-plaintiffs from exercising certain constitutional rights and to prevent Mrs. Cruz from representing TDC inmates in civil rights litigation. Under the circumstances, such actions must be found to have been taken unjustifiably and in bad faith.

These findings are not clearly erroneous. Beto points to reports he received from two TDC wardens who testified generally to activities among Cruz and her clients causing unrest among other prisoners. The district court found that the testimony was either not credible or not persuasive and that Beto could not have relied "prudently and in good faith, if at all, on information supplied by him to TDC staff members such as those who testified." Significantly, the wardens' testimony was not supplemented by the testimony of even one of the prisoners who allegedly complained of plaintiffs' conduct. In fact, defendant offered no tangible proof of specific instances of disrup-

tive activity or of organized efforts on the part of plaintiffs to undermine the prison administration.

Moreover, there was evidence tending to show that Beto's true motivation was a desire to rid the TDC of the troublesome suits filed by Cruz on behalf of her prisoner-clients. Rather than attempt to resolve differences through appropriate and available legal channels, Beto took arbitrary action against Cruz without first complaining to any law enforcement agency, to the state bar association, or to any grievance committee that she had committed an improper act or participated in any unethical behavior. When Cruz was first barred from TDC she had a proper attorney-client relationship with the prisoner-plaintiffs, representing them in lawsuits pending at every level of both the state and federal judicial systems. She had had a long and distinguished career in public service, and had never been charged with violating any TDC rules or regulations or encouraging any prisoners to do so. Furthermore, in a memo to the Attorney General, Beto stated that the purpose of segregating Cruz's clients was to "phase out" her work at TDC.

There is ample evidence to support the district court's finding that the sole criterion for segregating the prisoner-plaintiffs was their status as clients of Cruz. During the eleven months of their confinement, members of the Eight Hoe Squad were repeatedly told by prison officials that they could obtain release simply by ending their attorney-client relationship with Cruz. The three prisoners who did so were not only released from segregation but were placed in positions of trust and responsibility wholly inconsistent with Beto's contention that they represented a threat to prison security. Thus, there is no clear error in the district court's finding that

> [T]he evidence demonstrates that defendant Beto instituted reprisals against Mrs. Cruz and, by association, those prisoners including the prisoner-plaintiffs who were her clients, for reasons totally unrelated to considerations of proper prison administration. Such actions were taken in violation of Mrs. Cruz's constitutional

rights. Defendant Beto did not act with good purpose and with a belief that he was doing right.

■ The defendant also challenges the amount of attorney's fees awarded to plaintiffs. The attorney's fee award was carefully calculated by the district court upon submission of affidavits by plaintiffs' counsel and a hearing. The court fully supported the award in an opinion thoroughly considering the factors of *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974). We find no error.

■ All parties challenge the amount of damages awarded. Our review of damage awards is limited to a finding of abuse of discretion. *Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033 (5th Cir. 1970), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972). The district court developed a formula to determine the damages incurred by each of the 12 individual prisoner-plaintiffs due to deprivations and humiliation they were required to accept while segregated because of their lawyer-client relationship with plaintiff Cruz. The aggregate award totalled $9,291.00. Cruz's separate award of $1,000.00 was based on the embarrassment, humiliation and improper deprivation by defendant Beto of the right to practice law through representation of TDC inmates. These amounts are well within the court's discretion, based upon the evidence submitted. On both direct and cross appeal, the judgment appealed from is

AFFIRMED.

GEE, Circuit Judge, specially concurring:

With considerable reluctance, I concur in the opinion of the court. My difficulty stems from two sources. The first is that my reading of the record convinces me that Dr. Beto's actions in the premises were each and all taken in *general* good faith, that is, in the belief that the trammels placed by him on Mrs. Cruz' activities were in the best interests of the prison as an institution. The second is that insofar as the technical want of good faith which controls here is

concerned, I am able to say no more for the fact findings below than that they are not clearly erroneous. That I might well, on this record, have found otherwise therefore does not signify.