**Wayne Ernest BARKER,
Plaintiff-Appellant,**

v.

**Ben NORMAN and Jack Ballas,
Defendants-Appellees.**

No. 80–1288
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

July 30, 1981.

1110

Wayne E. Barker, pro se.

David L. Crawford, Houston, Tex., for Norman.

Maria Angela Flores, Houston, Tex., for Ballas.

Before GEE, RUBIN and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

Plaintiff-Appellant Wayne Ernest Barker brings this appeal * from an adverse summary judgment in the court below in his suit for damages and injunctive relief against the two Defendant-Appellees, Officer Ben Norman of the Houston Police Department (HPD), and Agent Jack Ballas of the United States Bureau of Alcohol, Tobacco & Firearms (ATF). Barker alleges that Officer Norman and Agent Ballas conspired to violate a number of the rights secured to him by the United States Constitution; as to Officer Norman, his suit is premised on 42 U.S.C. § 1983 (1976),[1] and as

---

\* No party in this case requested oral argument, and no judge on the summary calendar panel determined that oral argument was necessary. In these circumstances, Fifth Circuit Local Rules 13.6.4 and 18.2 allow us to decide this case without oral argument, despite the fact that one member of the panel concurs in part and dissents in part. *See Tew v. Schweiker,* 642 F.2d 925, 926 n.1 (5th Cir. 1981).

1. Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1976).

to Agent Ballas, his suit is premised on a *Bivens*[2] constitutional tort claim.[3] The alleged violations of his rights arose from Officer Norman's search of Barker's Houston apartment, the alleged coercion of Barker's guilty plea to a federal firearms charge by the use of property seized from the apartment, and the retention of some of the seized property by Officer Norman despite Barker's demands for its return. The court below granted summary judgment in favor of both defendants, holding that there was no genuine issue of disputed fact as to whether the defendants had established a defense of qualified immunity based on their good faith. For the reasons stated in this opinion, we affirm in part, reverse in part, and remand.

## I. FACTUAL BACKGROUND LEADING TO THIS APPEAL

### A. Allegations in Barker's Complaint: One Side of the Story

Agent Ballas arrested Barker in Westmoreland, Kansas, on September 14, 1976, for allegedly violating the Gun Control Act of 1968, 18 U.S.C. § 922(h) (1976), by possessing a .38 caliber revolver.[4] Barker pleaded not guilty at his arraignment. Trial was set for November 8, 1976, and Barker was released on bond, after which he apparently returned to Texas. The story he relates in his verified petition begins at that point, and, insofar as it pertains to this lawsuit, this is the way the story goes:

Barker left his wife, Jacqueline, at her father's home in Carrollton, Texas, on November 2, 1976. Barker and Jack Taylor,[5] his father-in-law, had had a disagreement

on several matters, including Barker's possession of certain tapes and notes that had to do with Barker's search for his wife during a period when he thought she was being held against her will by drug traffickers in the Killeen, Texas, area. Taylor's long-distance phone records, according to Barker, would confirm that Taylor phoned the Houston Police Department on November 3, 1976. Barker alleges that in this call, Taylor sought to induce HPD to seize these tapes and notes. Officer Norman, acting in Taylor's behalf, then contacted ATF Agent Ballas. Agent Ballas, according to Barker, "gave unauthorized sanction" to Officer Norman to search Barker's apartment in Houston, and to seize the tapes and notes along with anything else helpful to the federal firearms prosecution in Kansas.

Barker alleges that as a result of Taylor's call and Ballas' encouragement, Officer Norman forced his way into Barker's apartment on that same day over the objections of the temporary occupant, Gail Blanchard Keller; Barker was not present at the time. Officer Norman placed Keller in his custody for having "aided and abetted a fugitive." According to Barker, Officer Norman acted without a warrant or probable cause in entering the apartment; he lacked a good faith belief that a crime was in progress or was about to be committed; and he knew or should have known that his actions were unlawful and in reckless disregard of Barker's rights. Officer Norman seized and carried away a number of items of Barker's personal property, including twelve cassette tapes, two tape recorders and associated

---

2. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See also Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

3. Subject matter jurisdiction for the § 1983 claim against Officer Norman is predicated on 28 U.S.C. § 1343(3) (1976). Subject matter jurisdiction for the *Bivens* claim against Agent Ballas is predicated on 28 U.S.C. § 1331(a) (1976).

4. Barker had been convicted in Ohio in 1958 on a felony charge of armed robbery, and as a convicted felon, his possession of a firearm that had been transported in interstate commerce constituted a new crime.

5. Barker named Taylor as a defendant in this suit on the ground that he participated in the alleged conspiracy. During the pendency of the suit, Taylor died; while the suit has, of course, abated as to Taylor, his activities remain relevant to the alleged conspiracy.

equipment, a telephone, four walkie-talkies, a pair of binoculars, legal papers relating to the Kansas firearms charge, and other legal opinions and notes. Several of the tapes related conversations between Barker and his appointed counsel in the Kansas case, John O. Martin. Other tapes pertained to matters not directly relevant to this lawsuit. The legal papers outlined Barker's defense strategy in the Kansas case.

Later that afternoon, Officer Norman allegedly broke into and searched a Volkswagen automobile that was lawfully in Barker's possession; the car belonged to Barker's "mother's son-in-law." Barker's mother, Laura Barker, protested that the search of the car was against the law, but Officer Norman allegedly replied, "I'm the law." Barker alleges that the search was without a warrant or probable cause, and that Officer Norman knew or should have known that his actions were unlawful and in violation of Barker's rights. At 5:00 p. m., Officer Norman had the car towed away, despite Barker's mother's objections.

Houston attorney John J. Knoff, with whom Barker had worked on prior occasions, contacted Norman on November 4, 1976. Officer Norman told Knoff he had just seized the automobile; during a search of the car, he had discovered 45 bags of marijuana and a sawed-off shotgun. Officer Norman left a message with Knoff to have Barker call Officer Norman.

Barker further alleges that on November 5, 1976, he called Officer Norman and asked for the return of the car, the personal property from the apartment, and ten or more photographs of his wife that had been in the car. After ascertaining that no charges had been filed against him in Houston as a result of the search and seizure, Barker asked as to the whereabouts of the marijuana and the shotgun. Officer Norman told Barker that Agent Ballas had taken the marijuana and shotgun to Kansas, along with several of the tapes and the legal papers. Officer Norman also told Barker that several other tapes were no longer in Officer Norman's possession, and that he would return the car and the other property

after Barker returned from the November 8, 1976, trial in Kansas. Barker asked about the ultimate disposition of the claim that Officer Norman had found marijuana in the car, and Officer Norman replied, "It depends on what you do in Topeka." However, Officer Norman said he would not go to Topeka to testify.

Barker telephoned his attorney in the firearms case (John O. Martin, apparently) to go over their defense strategies. Barker alleges that Martin told him in this conversation that Assistant U. S. Attorney Bruce E. Miller, the prosecutor in the case, had told Martin that he (AUSA Miller) had possession of incriminating tapes, marijuana, and a shotgun—all of which AUSA Miller intended to use as evidence against Barker at the trial. Martin then "intimated" that AUSA Miller also had in his possession tapes and notes relating to Barker's defense strategy; for this reason, Martin had prepared no defense and the trial court would grant no continuance. Martin told Barker that AUSA Miller was "running the court" and that Miller could do whatever he wanted, including using hearsay "if he did not actually have anything incriminating of a physical nature."

Barker alleges that on the next day, before the trial, AUSA Miller "conveyed" to him that if he pleaded guilty, he would be continued on bond for 45 days; otherwise, he would be convicted by "whatever means" and prevented from being released on appeal bond and seeing his wife again. Barker's wife had pleaded urgently with Barker by phone on two occasions, urging him to return to Taylor's home to pick her up. Barker alleges that AUSA Miller's threats, when combined with the personal pressure on Barker to retain some measure of freedom so that he could "rescue" his wife, operated to overcome his will to fight the firearm charges. He pleaded guilty and was continued on bond pending sentencing.

Barker alleges that after entering his plea he talked to Agent Ballas in the hallway. Barker's complaint sets out the substance of this conversation by quoting an affidavit that he says Keller gave in the

Kansas proceeding wherein Barker tried to withdraw his guilty plea. Keller was a witness to the conversation, according to Barker. Although Barker quotes this affidavit, the affidavit itself does not appear in the record. According to the quoted portion, Agent Ballas said that he had flown an agent to Houston, and the agent had brought back the tapes, marijuana, and shotgun. Agent Ballas said that he had listened to most of the tapes, and he told Barker that the government had planned to introduce all of this as evidence if Barker had gone to trial. Barker replied that he had been told by his attorney that the evidence would have been used only to take him off bond, but Agent Ballas said that, to the contrary, they would have used the seized property at trial.

Barker picked up his wife on November 10, 1976, and they confronted Officer Norman at Norman's office on November 14. Officer Norman told Barker "it was all over" as far as Norman was concerned, and told Barker that Norman had been "put in a cross by the federal people." Barker picked up the Volkswagen automobile, but Officer Norman refused to return the personal property.[6]

On December 14, "after further information leading [Barker] to believe that he had been unlawfully coerced into pleading guilty to the federal firearms violation," Barker filed a motion with the federal district court in Kansas to withdraw his guilty plea. On December 21–22, 1976, Barker argued his plea withdrawal motion; he had dismissed his court-appointed counsel, Martin. At the hearing, according to Barker, AUSA Miller admitted that the threat he had used had no valid basis, that the information regarding allegedly incriminating items was fifth or sixth level hearsay, and that he had never seen the items and did not know who had seen them, or even if they existed. Nonetheless, Barker's motion was denied, and he was sentenced to three years. His conviction and the denial of the

plea withdrawal motion were affirmed by the United States Court of Appeals for the Tenth Circuit on July 12, 1978, *Barker v. United States*, 579 F.2d 1219 (10th Cir. 1978), but by May 18, 1978, Barker had been paroled.

Barker characterizes his suit as stating a number of causes of action under various provisions of the United States Constitution. Broadly construed, the first two claims are that the three defendants conspired to and did violate his Fourth Amendment right to be free from unreasonable searches and seizures, with associated violations of his rights to privacy, first when Officer Norman searched his apartment, and again when Officer Norman seized various items therein and the automobile outside. The third claim is that the concerted actions of Taylor, Agent Ballas, and Officer Norman combined to deny him a fair trial in Kansas on the firearms violation by denying him effective assistance of counsel and coercing him into entering a plea of guilty. The fourth claim is that the defendants conspired to deprive him of his property without due process of law, in violation of the Fifth and Fourteenth Amendments, by unlawfully retaining the seized items despite Barker's demands for their return. These claims will be referred to hereinafter in this opinion as the search and seizure claims, the coerced plea claim, and the property retention claim, respectively.

It is unclear from the district court's opinion what weight, if any, it gave to Barker's various pleadings in its consideration of the summary judgment motions. We note that Fed.R.Civ.P. 56(e)

demands that both supporting and opposing affidavits be made on personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that [the] affiant is competent to testify to the matters stated therein. To the extent that a verified pleading meets that requirement then it may properly be considered as equivalent to a supporting or opposing affidavit, as the case may be.

---

6. At this point in his complaint, Barker denied the existence of the marijuana and shotgun that were allegedly seized from the car.

6 (pt. 1) J. Moore, Federal Practice ¶ 56.-11[3], at 56–250 to –251 (2d ed. 1976) (footnotes omitted). *Accord, Gordon v. Watson,* 622 F.2d 120, 123 (5th Cir. 1980); *Runnels v. Rosendale,* 499 F.2d 733, 734 n.1 (9th Cir. 1974); *Fowler v. Southern Bell Telephone & Telegraph Co.,* 343 F.2d 150, 154 (5th Cir. 1965). To the extent that Barker's verified complaint satisfies the other standards for affidavits as set out in Rule 56(e), then, we shall consider it to have an effect equivalent to that of an affidavit in opposition to Agent Ballas' and Officer Norman's summary judgment motions.

### B. Officer Norman's Admissions and Affidavit: Another Side of the Story

Officer Norman answered Barker's complaint with a general denial. Shortly thereafter, Barker filed a number of requests for admissions of fact. Officer Norman's verified response admits the following: Officer Norman had entered Barker's apartment on November 3, 1976, at the invitation of Keller, who was the only person there. He did not have a warrant. He seized and brought to the police station twelve tapes, one tape recorder and some associated equipment, three walkie-talkies, and a pair of binoculars. He denies having seized one of the cassette recorders and a telephone pickup coil that Barker had described in his complaint, and admits that he had turned over the seized telephone to the phone company after verifying that it had been illegally installed. He also admits that the seized notes and legal opinions had been returned to Barker when Barker picked up the Volkswagen.

Officer Norman further admits that he had searched the Volkswagen and had had it towed away; but this was only after: (1) Keller had told him that the car had marijuana and the shotgun in its trunk; (2) he had determined that the car was registered to G & H Contractors of Duncanville, Texas; and (3) he had checked with the assist-ant district attorney on duty who had advised him that since Barker had charges already pending in Kansas, no additional charges should be filed.[7]

Officer Norman was asked to admit that the following statement by Barker was true: "That any property now in you[r] possession having once belonged to Wayne Ernest Barker has not prior to this suit been offered returned to him." Officer Norman refuses to admit the truth of this statement; the necessary implication, then, is that at some point prior to the suit, according to Officer Norman, an offer to return the property to Barker had been made. Finally, Officer Norman admits that he had engaged in conversations with federal agents regarding the tape recordings that he had seized from Barker's apartment, but the nature of the conversations is nowhere detailed.

Attached to Officer Norman's motion for summary judgment is an affidavit that amplifies slightly upon his version of the facts as set out in the answers to Barker's requests for admissions. Officer Norman testifies in his affidavit that his purpose in visiting Barker's apartment had been to investigate a report that Barker had hauled marijuana and illegal weapons from Dallas to Houston on the previous night; he did not intend to make arrests, nor to seize any property. He knocked on the apartment door, identified himself as a police officer, and was invited to enter by Keller. While inside, Keller told Officer Norman that she had moved in about a week earlier. She told him that the cassette tapes, a cassette recorder and some associated equipment, three walkie-talkies, and a pair of binoculars were stolen property. The items were all in plain view. Officer Norman's affidavit states: "It was, and is, my belief that none of this property belonged to plaintiff Barker. Additionally,

---

**7.** Regarding the phone conversation with attorney John Knoff, Officer Norman admits having talked to Knoff at some time during the investigation. Knoff had inquired if any charges were being filed as a result of the search, and Officer Norman told Knoff that there would be no charges filed. Officer Norman also admits that he had talked to Barker by phone, at which time he told Barker that no charges would be filed and that he could pick up the Volkswagen and the papers.

Mr. Barker subsequently informed me the property was stolen, and that he did not want this property."[8]

Finally, Officer Norman's affidavit makes the following assertion:

> With respect to all and any items of property seized, I acted on the basis of circumstances which were known to me at the time. These circumstances, based on information transmitted to me by Keller and Mr. Barker's mother, and my own on-the-scene observations based on my four years of experience as a Detective in the Burglary & Theft Division and my seventeen years prior experience as a Police officer, led me to conclude that under state law, the items seized were seized as stolen goods and/or illegal contraband and weapons.

Based on this affidavit, Officer Norman moved for summary judgment on the ground that there was no genuine issue of fact remaining as to his legal justification for seizing and retaining the items. In *none* of his pleadings does Officer Norman assert that he is entitled to claim a qualified official immunity from liability under section 1983.

---

**8.** Officer Norman also avers that he seized the Volkswagen in the belief that it was a stolen vehicle. He had determined that the car was registered to G&H Contractors of Duncanville, Texas, and Keller had told him that she did not know to whom the car belonged. Keller had also told him that marijuana and a shotgun were in the trunk. Officer Norman's search of the car revealed a suitcase containing 43 baggies of marijuana and a shotgun; these items were seized as contraband, and the car was returned to Barker after contacting the registered owners. No charges were filed, however, because Barker was about to be incarcerated on the federal firearms violation in Kansas.

**9.** The first affidavit is from Ballas' supervisor, Charles R. Harvey, the Special Agent in Charge for the Bureau of Alcohol, Tobacco & Firearms in the Kansas City District Office. Harvey avers that he was familiar with Ballas' affidavit (discussed above in text), and that he has confirmed that the actions described in Ballas' affidavit occurred within the scope of Special Agent Pallas' authority as an ATF agent.

Another affidavit is from ATF Agent Peter W. Lobdell. Lobdell avers that he assisted Ballas in the investigation of Barker. At Ballas'

## C. Agent Ballas' Summary Judgment Materials: The Defendants' Story ·from Another Angle

Prior to filing an answer, ATF Agent Ballas moved for summary judgment on the basis of three affidavits filed simultaneously with the motion and supporting memorandum. Two affidavits were from fellow ATF agents.[9] The third affidavit submitted with the summary judgment motion is that of Agent Ballas himself. Ballas avers that on September 13, 1976, he learned from an agent of the Kansas Bureau of Investigation that Barker had been disarmed in Pottawatomie County, Kansas, after the KBI agent had learned that Barker was a convicted felon. That same day, Agent Ballas obtained an arrest warrant from a U.S. Magistrate in Kansas City, Kansas, and· on the next day, September 14, 1976, Agent Ballas arrested Barker in Westmoreland, Kansas.

During the remainder of September and the month of October, Agent Ballas continued the investigation, obtaining documents relating to Barker's prior felony conviction and incarceration, and running firearm and fingerprint traces. Agent Ballas talked with Barker on several occasions.[10] After a

---

request, Lobdell traveled to Houston to pick up evidence in the custody of the Houston Police Department that related to Barker's firearms charge in Kansas. On Saturday, November 6, 1976, Lobdell received from HPD a sawed-off shotgun and several photographs. On Monday, November 8, 1976, Lobdell turned these items over to Agent Ballas for purposes of the investigation. Approximately two weeks later, when the items were no longer needed, Lobdell returned them to HPD by registered mail. Lobdell avers that he did not recall any tapes or marijuana, and that he has no knowledge that Agent Ballas initiated any actions by HPD to obtain the shotgun, marijuana, or photographs.

**10.** During these conversations Barker assured Agent Ballas that upon his release, he would supply Agent Ballas with information "that would incarcerate half the criminals in the State of Texas because [Ballas] *was the only one who had been fair with him.*" (Emphasis in original.) Additionally, Agent Ballas "made attempts to locate Barker's wife as a potential government witness which he felt was in his behalf."

preliminary hearing in Topeka, Agent Ballas received a phone call from Officer Norman, who informed Agent Ballas that during the course of conducting a search of Barker's apartment, Officer Norman had found official correspondence requiring Barker to answer to the firearms violation in Kansas. Agent Ballas avers in the affidavit that he cannot remember for certain who initiated what phone calls after that, but he does recall that he had relayed to AUSA Miller all information he had received. AUSA Miller instructed Agent Ballas to send an agent to Houston to pick up any information or evidence that would be relevant to the firearms charge, and to keep AUSA Miller advised as to the progress of the investigation. An ATF agent was sent to Houston to perform this task. He picked up from HPD a sawed-off shotgun, along with a homemade "reward" poster that sought to locate Barker's wife and photographs of Barker's wife; these items were to be used as leads in the attempt to locate her so that she could serve as a government witness.

Agent Ballas avers that "[a]ll evidence was returned to [the] Houston Police Department, Barker pled guilty and was sentenced, and I had no further dealing or thought on the matter." Agent Ballas specifically denies that he had become involved with HPD or Officer Norman until after the search had taken place; he had never even talked to Officer Norman prior to that time. He denies having ever met or talked to Taylor, Barker's father-in-law. Agent Ballas denies having encouraged anyone to perform a search of Barker's apartment.

Regarding Barker's allegations of his hallway conversation with Agent Ballas, Agent Ballas admits that he had discussed the shotgun with Barker after telling him that AUSA Miller had directed Agent Ballas to send an agent to Houston to get it. Agent Ballas denies that the marijuana or tapes had been brought back from Houston, and he further avers that he had at no time listened to any of Barker's tapes. Nor did he ever imply that any of the evidence brought back from Houston would have been introduced during the guilt phase of the trial had Barker gone to trial.

Finally, Agent Ballas avers that at all times during the investigation, he acted in good faith in accordance with accepted policies and his sworn duties as an ATF agent. He denies having ever engaged in any scheme or conspiracy to arrest and imprison Barker in violation of his constitutional rights, and asserts his belief that his activities were proper and in valid discharge of his duties as a federal law enforcement officer. In the memorandum accompanying his summary judgment motion and affidavits, Agent Ballas claims entitlement to a qualified official immunity, citing *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

## D. Barker's Responses to the Motions for Summary Judgment

After Agent Ballas moved for summary judgment, Barker filed an unverified "Memorandum in Opposition to Defendant Ballas' Motion for Summary Judgment." In conclusory terms, the memorandum asserts that there are still genuine issues of disputed fact, and further asserts that Agent Ballas had been operating outside his authority in having the evidence picked up from Houston.

Officer Norman's summary judgment motion and affidavit were filed on September 21, 1979. In response, Barker filed on October 5, 1979, a responding memorandum with an attached affidavit. The memorandum asserts in conclusory terms that there are still genuine issues of fact remaining in the case, and then goes on to assert that Keller had no standing to consent to the apartment search and that among the papers seized by Officer Norman were bills of sale for several of the items seized as stolen. The memorandum further asserts that there was no adequate legal justification for the seizure or the retention of the property.

In the affidavit attached to the memorandum, Barker avers that after the property was seized, Keller told Barker that Officer Norman had told her at the time of the

seizure that he was taking the property to induce Barker to contact him. Keller also told Barker that, at the time of the seizure, she had told Officer Norman that she had been with Barker when he had purchased several of the items at a Radio Shack store, and that several of the bills of sale were in the apartment. The affidavit then avers that Barker requested Knoff to contact Officer Norman; Knoff did so, and afterwards informed Barker that Officer Norman had told Knoff that he would return the seized property to Barker as soon as he determined that it was not stolen.

The affidavit further states that Barker went to Officer Norman's office on November 14, 1976, at which time Officer Norman returned the Volkswagen; but Officer Norman refused to return anything else, saying he was still checking to see if the items were stolen. The affidavit says that both Barker and Knoff contacted Officer Norman on several later occasions, seeking the return of the property without success. At no time, according to what Keller and Barker's mother told Barker, did either woman ever tell Officer Norman that any of the seized property was stolen; rather, they told Barker that they had told Officer Norman that the property was *not* stolen. Barker's mother also told him that she had offered to show Officer Norman bills of sale covering some of the property.

Finally, the affidavit states that there is nothing in the record to indicate Officer Norman's good faith belief that his seizure of the property was lawful, and if he did believe in the lawfulness of his acts, that belief was unreasonable because the property had not been reported as stolen. The property has never been verified as stolen, according to the affidavit; it concludes with the assertion that Barker is entitled to the return of the property or compensation for its loss.

### E. Action in the District Court

In an unpublished memorandum decision entered January 21, 1980, the court below granted summary judgment in full as to both defendants. The court characterized both defendants as having moved for summary judgment on qualified immunity grounds and reviewed the contentions of both defendants' pleadings.[11] In short, the court concluded that Barker had failed to put into dispute by competent summary judgment material the question of whether Agent Ballas had acted outside the scope of his authority, and that there was no genuine issue of fact as to whether Agent Ballas had encouraged or even known of the search and seizure or property retention after the seizure. As to Officer Norman, the court found no issue of fact as to whether the search was justified by Keller's consent, or as to Officer Norman's lack of malicious intent. The court concluded that neither defendant had forfeited his right to qualified immunity from this type of suit, and that their acts had been in good faith under either an objective or subjective standard. Accordingly, summary judgment was granted and Barker's suit was dismissed. The court did not advert to the retention of seized property issue; although it mentioned the coerced plea cause of action in an introductory paragraph, it did not otherwise deal with that issue.[12]

## II. THE NECESSITY OF NOTICE AND ORAL ARGUMENT ON SUMMARY JUDGMENT MOTIONS

■ In his first point of appeal, Barker argues that he was entitled under Fed.R.

---

11. It is unclear whether the court gave Barker's verified complaint equivalent weight to an affidavit insofar as it otherwise met the requirements of Rule 56(e), for it never discussed Barker's contentions in detail.

12. After summary judgment was entered, Barker filed two motions to have it set aside. On the day that he filed the second, the court below overruled the first. Attached to the second motion was an affidavit made by Barker wherein he transcribed at length a phone call he had had with Keller. According to the transcript, Keller sharply disputed Officer Norman's claims that the apartment search was consensual and that Keller told him the various items of property were stolen. It is unclear whether the district court ever considered the second motion and attached affidavit.

Civ.P. 56(c) to a hearing at which he could orally present his arguments as to why there was still a genuine issue of material fact remaining in the case.[13] While the usual practice of most district courts is to hold oral argument on motions for summary judgment before deciding them, this is not required by Rule 56(c). We held in *Kibort v. Hampton*, 538 F.2d 90, 91 (5th Cir. 1976), that while Rule 56(c) contemplates notice to an adverse party and a "hearing" before the court rules on a summary judgment motion, the "hearing" need not be one in which the court receives oral argument.[14] *Kibort*'s reading of Rule 56(c) is that the adverse party is entitled to have ten days advance notice that the matter will be "heard" by the court—*i. e.*, that the matter will be taken under advisement as of a certain date. To be "heard" in this sense does not necessarily require argument in open court. *See also Capital Films Corp. v. Charles Fries Productions, Inc.*, 628 F.2d 387, 391–92 (5th Cir. 1980).

■ The record in this case indicates that Barker received the requisite notice that the defendants' summary judgment motions were to be taken under advisement by the court. Agent Ballas' summary judgment motion contained a proper "Notice of Motion" certification, which indicated that it would be taken under consideration on August 28, 1978. Officer Norman's motion did not include a "Notice of Motion" certification, but the docket sheet shows that the court clerk set a submission date of October 15, 1979, and notified the parties. Barker in fact responded to both of these motions before the date of their submission to the court. We conclude that, unlike the plaintiffs in *Kibort* and *Capital Films*, Barker had been "heard" within the meaning of the "hearing" requirements of Rule 56(c) when the court below ruled on the summary judgment motions.[15]

## III. LAW APPLICABLE TO SUMMARY JUDGMENTS ON QUALIFIED IMMUNITY GROUNDS

The district court granted summary judgment because it found no genuine issue of

---

**13.** Rule 56(c) provides, in pertinent part, as follows:

 The motion [for summary judgment] shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

**14.** We made these comments in *Kibort* in interpreting the language of Rule 56(c) that is set out in note 13, *supra*:

 We have previously interpreted this language as requiring notice to an adverse party and a hearing. *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 863 (5th Cir. 1970); *Georgia Southern & Fla. Ry. Co. v. Atlantic Coast Line R. R. Co.*, 373 F.2d 493, 496–497 [(5th Cir), *cert. denied*, 389 U.S. 851, 88 S.Ct. 69, 19 L.Ed.2d 120 (1967)]; *Enochs v. Sisson*, 301 F.2d 125, 126 (5th Cir. 1962). As indicated by the *Bon Air* decision, though, "hearing" does not necessarily mean an oral hearing. *What the rule contemplates is 10 day[s] advance notice to the adverse party that the matter will be heard and taken under advisement as of a certain day.* This provides the

adverse party with an opportunity to prepare and submit affidavits, memoranda and other materials for the court to consider when ruling on the motion. If the adverse party is given this opportunity, then *he has been heard within the meaning of Rule 56.*

 Here the plaintiff received neither notice or a hearing. There was no reason for the plaintiff to suspect that the court was about to rule on the motion. If plaintiff had been given notice (by the defendants or the court), he may have submitted additional materials or moved for an extension of time to develop such materials through discovery.

 This failure to provide either notice or a hearing in this case cut off plaintiff's opportunity to develop a record on which the court could fairly rule on the merits of his complaint.

538 F.2d at 91 (footnote omitted; emphasis added).

**15.** *But cf. Slavin v. Curry*, 574 F.2d 1256, 1262 (5th Cir. 1978) ("[t]he existence and the extent of any immunity defense depends upon the position occupied by the defendant as well as the motivation of the defendant.... [F]or those having only a qualified immunity, a [full-scale] hearing is usually necessary to determine whether the defendant's motivation entitles him to a defense of good faith.").

material fact as to any fact necessary to establish the defendants' qualified immunity defenses. As we have noted, only Agent Ballas had proffered such a defense; the district court apparently supplied it for Officer Norman. In order to review the district court's ruling on this issue, we must ascertain the scope of the qualified immunity defenses available to a law enforcement officer and the circumstances in which summary judgment may be proper, given the scope of those defenses.

*A. The Scope of the Qualified Immunity Defenses*

■ *1. Officer Norman's qualified immunity from section 1983 liability.*—Our past cases indicate that police officers are entitled to assert a defense of official immunity from section 1983 liability based on the officer's reasonable belief that his actions were lawful and within the scope of his authority; but the cases also hold that this official immunity is but a qualified one, for it can be breached by a showing that the officer lacked "good faith." *E. g., Reimer v. Short*, 578 F.2d 621, 627–28 (5th Cir. 1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1425, 59 L.Ed.2d 635 (1979). *Cf. Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (good faith defense to section 1983 liability for officers making an arrest with probable cause); *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (extending good faith defense to prison officials). *See generally* S. Nahmod, Civil Rights & Civil Liberties Litigation: A Guide to Section 1983, at §§ 8.02, 8.08 (1979 & 1980 Supp.).

■ Qualified immunity from section 1983 liability is an affirmative defense in the sense that it must be pleaded [16] by the defendant. *Gomez v. Toledo*, 446 U.S. 635,

100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The Supreme Court has, in dictum, recently confirmed our circuit's position that the burden is on the defendant not just to plead, but to establish his entitlement to claim official immunity in the first instance:

> The immunities of state officials that we have recognized for purposes of § 1983 are the equivalents of those that were recognized at common law, *Owen v. City of Independence*, 445 U.S. 622, 637, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980); *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976); and the burden is on the official claiming immunity to demonstrate his entitlement. *Cf. Butz v. Economou*, 438 U.S. 478, 506 [98 S.Ct. 2894, 2910, 57 L.Ed.2d 895] (1978).

*Dennis v. Sparks*, 449 U.S. 24, 29, 101 S.Ct. 183, 187, 66 L.Ed.2d 185 (1980) (holding that private individuals who allegedly bribed state trial judge to issue injunction were not shielded in section 1983 action for damages by judge's absolute immunity). Once pleaded, "the showing that a defendant must make to avail himself of the qualified immunity defense varies depending upon the degree of discretion that he exercises in performing his official duties." *Douthit v. Jones*, 619 F.2d 527, 534 (5th Cir. 1980). We held in *Douthit* that

> [w]hen a plaintiff seeks damages under § 1983 for a discretionary action by an official such as a prison administrator, who must exercise an exceedingly broad range of discretion in performing his official duties, *the official should be entitled to qualified immunity upon a showing that he acted within the scope of his authority.*

*Id.* (emphasis added).[17] We contrasted the showing that needed to be made by the

---

16. It may be permissible, however, to raise this affirmative defense for the first time in a motion for summary judgment. *See* 6 (pt. 2) J. Moore, Federal Practice ¶ 56.17[4], at 56–736 to –741 (2d ed. 1980); *but cf. Funding Systems Leasing Corp. v. Pugh*, 530 F.2d 91, 95–96 (5th Cir. 1976) (state statute of frauds defense waived when raised for first time in brief in support of summary judgment motion after de-

fendant had answered and court had entered pretrial order; affirmative defense can be raised by summary judgment motion only when that motion is the initial pleading tendered by the defendant).

17. *Cf. McCray v. Burrell*, 516 F.2d 357, 370 (4th Cir. 1975) (qualified immunity defense available only after defendants have met burden of proof that they had a good faith belief in the

prison officials in *Douthit* to that which need be made by an official of more limited discretion, such as a police officer; the latter type of official must demonstrate objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority. *See* 619 F.2d at 534.[18]

 Once the official has shown that he was acting in his official capacity and within the scope of his discretionary authority, the burden shifts to the plaintiff to breach the official's immunity by showing that the official lacked "good faith." *Id.* In *Bogard v. Cook*, 586 F.2d 399 (5th Cir. 1978), *cert. denied*, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979), we fleshed out the definition of "good faith" in this context. *Bogard* makes clear that there are both objective and subjective components to the analysis of good faith. The objective component has to do with the reasonableness of the official's actions under clearly established law at the time he acted:

> [A]n official is liable under section 1983 "if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights" of the person affected. The fulcrum ... is the

existence, at the time of the official's action, of clearly established judicial decisions that make his action unconstitutional.

*Id.* at 411 (citation omitted) (quoting *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975)). This is true despite the official's sincere subjective belief that he is acting properly. *Id.* As the Sixth Circuit has noted, "[t]he law does not expect police officers to be sophisticated constitutional or criminal lawyers, but because they are charged with the responsibility of enforcing the law, it is not unreasonable to expect them to have some knowledge of it." *Glasson v. City of Louisville*, 518 F.2d 899, 910 (6th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975). *See also Jackson v. Mississippi*, 644 F.2d 1142, 1145 (5th Cir. 1981); *Dilmore v. Stubbs*, 636 F.2d 966, 968–69 (5th Cir. 1981).

The subjective component of the defendant's "good faith" has to do with the presence or absence of "malicious intent," which the plaintiff may show by proof

> that an official either actually intended to do harm to the plaintiff, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result. The spirit of the

---

legality of their actions), *cert. dism'd as improvidently granted*, 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976); *United States ex rel. Land v. Sielaff*, 564 F.2d 153, 155 n.2 (3d Cir. 1977); *United States ex rel. Tyrrell v. Speaker*, 535 F.2d 823, 827–29 (3d Cir. 1976).

18. It should be clear from our prior caselaw that an official's actions may be so far removed from the ordinary course of his duties, so outside even his discretionary authority to act, that the official cannot establish his entitlement to claim immunity in the first instance; yet there may be a sufficient nexus between the official's position and the complained-of conduct to satisfy § 1983's "under color of state law" requirement. In this situation the defendant may be entitled to no immunity from § 1983 liability whatsoever.

For example, in *Harper v. Merckle*, 638 F.2d 848 (5th Cir. 1981), the plaintiff had stopped by the chambers of a state judge to inquire where he should forward his child-support payments to his wife. The judge decided that he needed to place the plaintiff under oath in an ex parte

proceeding to determine the plaintiff's correct address; when the plaintiff fled the scene, the judge had him apprehended and found the plaintiff in "contempt" in a summary hearing in which the judge served as complaining witness, prosecutor, factfinder, and judge. We held that the judge's actions were not "judicial acts" because they were not undertaken in connection with any matter then pending before the judge, and neither did they arise from a visit to the judge in his official capacity. Therefore, the judge was not entitled to claim the absolute immunity from § 1983 liability that is normally afforded judges. There was no question, however, that the judge's actions in that case were undertaken under color of state law: had the defendant not been a state officer, he would not have been in a position to engage in the conduct of which he was accused.

In the case at bar, there is no question but that Officer Norman's conduct, under either his or Barker's version of the events surrounding the apartment search and property seizure, was undertaken under color of state law.

rule reaches nonfeasance as well as misfeasance. It does not insulate an official who, although not possessed of any actual malice or intent to harm, is so derelict in his duties that he must be treated as if he in fact desired the harmful results of his inaction. At the same time, however, the test requires that a plaintiff show that the official's action, although labeled as "reckless" or "grossly negligent," falls on the actual intent side of those terms, rather than on the side of simple negligence.

*Bogard,* 586 F.2d at 412.[19] *See also Crowe v. Lucas,* 595 F.2d 985, 989, 990 (5th Cir. 1979); *Cruz v. Beto,* 603 F.2d 1178, 1183 (5th Cir. 1979); *Vasquez v. Snow,* 616 F.2d 217, 220 (5th Cir. 1980); *Douthit v. Jones, supra,* 619 F.2d at 534–35; *Walters v. City of Ocean Springs,* 626 F.2d 1317, 1322–23 (5th Cir. 1980). *See generally* S. Nahmod, *supra,* §§ 8.03, 8.12.

Judge Charles Clark, writing for our court in *Cruz v. Beto, supra,* explained the rationale behind this allocation of the burdens of persuasion:

The underlying policy which pervades every qualified immunity analysis is one of protecting the public by permitting its decision-makers to function without fear that an exercise of discretion might in retrospect be found to be error. [Citing *Butz v. Economou, supra,* and *Pierson v. Ray, supra.*] If an official can show that [the] questionable actions were taken in the regular course of discharging his official duties, therefore, this policy affords him immunity from liability. To deny him qualified immunity protection unless he goes further and demonstrates that his actions were above the benchmark of le-

gal good faith, would make the concept of qualified immunity a meaningless embellishment.

603 F.2d at 1183.

■ *2. Ballas' qualified immunity defense to Bivens liability.*—The Second Circuit held in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339 (2d Cir. 1972) (on remand from 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)), that a police officer could assert as a defense to a *Bivens*-type constitutional tort claim his entitlement to a qualified immunity based on his reasonable, good-faith belief that his conduct was lawful. The rationale behind this qualified immunity is essentially the same as that behind the qualified immunity from section 1983 liability that is available to state officials. Some previous opinions of this court have treated the qualified immunity available in *Bivens*-type cases as being functionally equivalent to that available in section 1983 cases. *See, e. g., Reimer v. Short, supra,* 578 F.2d at 626–27. The Supreme Court adopted the same approach by holding in *Butz v. Economou,* 438 U.S. 478, 496–504, 98 S.Ct. 2894, 2905, 57 L.Ed.2d 895 (1978), that federal officials enjoy the same zone of protection when they are alleged to have violated federal constitutional rules as do state officials.

## B. The Propriety of Summary Judgments Based on the Qualified Immunity Defense

■ *1. General considerations.*—We begin with the familiar proposition that in reviewing a grant of summary judgment, this court will look at the record in the light

---

**19.** For certain causes of action under § 1983, malicious intent on the defendant's part may be relevant not just to the qualified immunity defense, but to whether there has been a deprivation of a constitutional right. *See, e. g., Reeves v. City of Jackson,* 608 F.2d 644, 650 (5th Cir. 1979) (warrantless and *malicious* arrest based on no probable cause violates liberty, and hence § 1983). Malice may also be relevant in determining the propriety of punitive damages. *See Carlson v. Green,* 446 U.S. 14, 21–22 & n.9, 100 S.Ct. 1468, 1473 & n.11, 64 L.Ed.2d 15 (1980); *Carey v. Piphus,* 435 U.S. 247, 257 n.11,

98 S.Ct. 1042, 1049 n.11, 55 L.Ed.2d 252 (1978); *Shillingford v. Holmes,* 634 F.2d 263, 266 (5th Cir. 1981). *But cf. City of Newport v. Fact Concerts, Inc.,* —— U.S. ——, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (municipalities not liable for punitive damages under § 1983). Malice may also be important—albeit in a different sense of that word—in the context of defamation actions against government officials. *See* Note, *Qualified Immunity for Federal Officials: A Proposed Standard for Defamation Cases,* 58 Texas L.Rev. 789 (1980).

most favorable to the party opposing the motion, drawing all inferences most favorable to that party. *E. g., Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *O'Boyle Tank Lines, Inc. v. Beckham*, 616 F.2d 207, 209 (5th Cir. 1980); *Walters v. City of Ocean Springs*, 626 F.2d 1317, 1322 (5th Cir. 1980) (reviewing summary judgment on section 1983 claim). Yet we are mindful of the Supreme Court's comments in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978):

> Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief under the Federal Constitution, it should not survive a motion to dismiss. Moreover, ... damage suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of [qualified] immunity. In *responding to such a motion*, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits.

*Id.* at 507–08, 98 S.Ct. at 2911 (footnote and citation omitted). As we recently said in *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980),

> [s]ummary judgment is an excellent device by which district courts may make expedited dispositions of those [section 1983] cases in which a trial would be fruitless. When summary judgment is inappropriate because the supporting or opposing materials are improper, the district court has ample discretion to call upon the parties to remedy the defects, by submitting affidavits or otherwise.

We also noted in that case that

> [a]lthough pro se litigants are not held to the same standards of compliance with formal or technical pleading rules applied to attorneys, we have never allowed such litigants to oppose summary judgments by the use of unsworn materials.

622 F.2d at 123 (footnote omitted). Further, the affidavits must affirmatively show the affiants' competence to testify as to the matters stated therein and that the facts stated in the affidavits are based on the affiants' personal knowledge. *Id.* See Fed. R.Civ.P. 56(e).

We emphasize that before summary judgment is proper, it first must be determined precisely what causes of action have been asserted and what issues are thus raised either by the complaint or by any defenses—regardless of whether one or more parties are proceeding pro se. In cases that involve complicated fact patterns and multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties but not as to others; the necessary predicate for a decision on a summary judgment motion is a sorting out of causes of action and defendants. This may require the court to exercise Job-like patience, particularly when dealing with pro se plaintiffs who may lack the legal reasoning skills to focus the court's attention on the nuances of their claims; further, counsel for the defendant may shortsightedly think it in the best interests of his client to remain silent when a claim is left unaddressed. Nonetheless, a careful and meticulous analysis—first by the parties, but ultimately by the district court—will aid significantly in preventing the waste of private and judicial resources and time.

*2. Two threshold issues.*—Once the claims and the parties are sorted out, there are two threshold issues that should, for conceptual purposes, be separated from the question of the applicability of a qualified immunity defense. The first would seem rather obvious: Is there a genuine issue of material fact as to the objective conduct of the defendant? If resolution of the issue in the summary judgment proceedings turns on what the defendant actually did, rather than on whether the defendant is immunized from liability for what he actually did, and if there are conflicting versions of his conduct, one of which would establish

and the other defeat liability, then the case is inappropriate for summary judgment on the basis that the defendant did not engage in conduct violative of the plaintiff's rights. This does not mean, however, that a defendant cannot pretermit the question of whether he engaged in the complained-of conduct in order to present instead the qualified immunity issue. There is no point in going to trial to determine whether the officer engaged in the complained-of conduct if the officer would be immunized from liability even if he did engage in that conduct.

We emphasize, too, that if the defendant has established beyond dispute that he *did not* engage in the complained-of conduct, then summary judgment is appropriate. A summary judgment on these grounds, however, has nothing to do with the qualified immunity defense; rather, it is based on the plaintiff's inability to prove the facts essential to recovery—*i. e.*, that the officer acted in a manner presumptively violative of the plaintiff's rights. *See, e. g., Broadway v. City of Montgomery*, 530 F.2d 657, 660–61 (5th Cir. 1976) (summary judgment proper on section 1983 claim founded on alleged illegal wiretapping when only summary judgment material relevant to factual issue as to whether wiretapping *actually occurred* was incompetent hearsay testimony).

▮▮▮ The second distinct issue that may arise is whether the complained-of conduct, if it in fact occurred, violated any right of the plaintiff. It is distinctly different to say that the conduct of the defendant did not violate a constitutional right of the plaintiff then to say that the defendant's conduct violated a constitutional right but the defendant is immunized from liability by virtue of a qualified official immunity. Again, this does not mean that a defendant cannot pretermit the question of constitutional deprivation in order to proceed to analysis under the qualified immunity doctrine. But if the complained-of conduct would not, as a legal matter, amount to a violation of rights secured to the plaintiff under the

Constitution of the United States,[20] then summary judgment is proper. *See Parratt v. Taylor*, —— U.S. ——, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). *Compare York v. City of Cedartown*, 648 F.2d 231 (5th Cir. 1981); *Hernandez v. City of Lafayette*, 643 F.2d 1188 (5th Cir. 1981); *Suthoff v. Yazoo County Industrial Development Corp.*, 637 F.2d 337 (5th Cir. 1981); and *Shillingford v. Holmes*, 634 F.2d 263 (5th Cir. 1981) (cases finding that the plaintiff had stated a valid claim of a deprivation of his constitutional rights), *with Simon v. United States*, 644 F.2d 490, 496 (5th Cir. 1981); and *Greer v. Turner*, 639 F.2d 229 (5th Cir. 1981) (cases finding no valid claim of a constitutional deprivation). This is true no matter whether, on the one hand, the complained-of conduct is established by undisputed facts or by admission arguendo, or, on the other, there is a genuine issue of fact as to whether the complained-of conduct occurred. This summary judgment would not be based on qualified immunity grounds, but instead on the lack of a legally sufficient predicate for section 1983 or *Bivens* liability.

Qualified immunity is yet a third distinct issue. While it is a complete defense to section 1983 or *Bivens* liability, it may be proffered either when the plaintiff has established that the defendant has engaged in the complained-of conduct, and that this conduct violated the plaintiff's constitutional rights, or by skipping, for the moment, over these still-contested matters to consider an issue that would moot their effect, if proved. In either event, analysis of the qualified immunity defense must proceed in two distinct steps.

▮▮▮ *3. Entitlement to claim official immunity.*—First, it must be determined whether the defendant, as a public official, acted within the scope of his discretionary authority. To establish this, there must be more than a bald assertion by the defendant that the complained-of actions were undertaken pursuant to the performance of

---

**20.** In § 1983 actions, as distinguished from *Bivens*-type actions, the rights that the plaintiff seeks to vindicate may be those protected under the Constitution *or laws* of the United States. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

his duties and within the scope of his discretionary authority; there must be a showing by competent summary judgment materials of objective circumstances that would compel that conclusion. See part III–A–1 of this opinion, *supra.*

Exactly what will suffice to establish such objective circumstances will, as *Douthit* and the other cases discussed in part III–A–1 above suggest, vary in proportion to the degree of discretion inherent in the defendant's office. Such objective circumstances necessarily must encompass the factual context within which the complained-of conduct took place. But also appropriate is a showing by the defendant of facts relating to the scope of his official duties—e. g., a showing of the circumstances through which he initially came to believe that his lawful authority included within its scope actions of the type that are complained of by the plaintiff. The Eighth Circuit has made the following remarks concerning this topic:

> The paradigm of "reasonable grounds" for a good faith belief in the propriety of official action is reliance on a state statute later declared unconstitutional. *See, e. g., Pierson v. Ray,* 386 U.S. 547, 556–57, 87 S.Ct. 1213 [1218], 18 L.Ed.2d 288 (1967). Reliance on less formal state provisions may also be reasonable, *Eslinger v. Thomas,* 476 F.2d 225, 229 (4th Cir. 1974) (longstanding custom of the South Carolina Senate); *Claybrone v. Thompson,* 368 F.Supp. 324 (M.D.Ala.1973) (standard operating procedures of prison), and in our view police officers may usually rely on standard operating procedures contained in their police manuals.

*Landrum v. Moats,* 576 F.2d 1320, 1327 n.14 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978).

Once the defendant has presented competent summary judgment materials that, if uncontroverted, would establish that there were, in fact, objective circumstances which compel the conclusion that the complained-of conduct was undertaken pursuant to the performance of his duties and within the scope of his discretionary

authority, he has made a prima facie showing that he is entitled to claim official immunity. At this point, the burden of proof shifts to the plaintiff, who cannot then "play dog in the manger," *Butz v. Economou,* 438 U.S. at 508, 98 S.Ct. at 2911. To rebut the defendant's prima facie showing, the plaintiff must come forward with controverting summary judgment materials competent to raise a genuine issue of fact as to whether the defendant undertook the complained-of conduct pursuant to the performance of his duties and within the scope of his discretionary authority—thereby raising a genuine issue of fact as to the validity of the prima facie case for immunity. If the prima facie showing is not rebutted by the plaintiff, then the defendant is, as a matter of law, entitled to claim official immunity from section 1983 or *Bivens* liability. *See Henzel v. Gerstein,* 608 F.2d 654, 659 (5th Cir. 1980); 10 C. Wright & A. Miller, Federal Practice and Procedure § 2727, at 536–37 (1973).

But this, by itself, does not mean that the defendant will ultimately prevail. If, because of the nature of his office, the defendant enjoys only qualified (as opposed to absolute) immunity, the plaintiff still has the opportunity, discussed in part III–A–1 above, to establish that the defendant's immunity should be abrogated because the defendant harbored a subjective malicious intent to harm the plaintiff, or because the defendant knew or should have known that his actions infringed a clearly established constitutional right of the plaintiff. This means that there is necessarily a second step in summary judgment analysis based on qualified immunity grounds.

4. *The qualification to the immunity based on the defendant's lack of "good faith."*—Once the defendant has established that he is entitled to claim official immunity, under *Douthit* the burden shifts to the plaintiff to establish that the immunity should be breached because either the defendant harbored a subjective malicious intent or he knew or should have known that his actions violated a clearly established constitutional right of the plaintiff.

For summary judgment purposes, this means that here again the plaintiff may no longer rest upon the unsupported allegations of his pleadings. Instead, he must establish that there is a genuine issue of material fact as to whether the defendant lacked "good faith"—*i. e.*, whether the defendant knew or reasonably should have known that he was violating the constitutional rights of the plaintiff, *or* the defendant maliciously intended to harm the plaintiff.

The first component of the "good faith" issue—whether the defendant knew or reasonably should have known under settled law at the time he acted that he was violating the plaintiff's constitutional rights—is obviously more susceptible to objective means of proof than the second component of the issue, which has to do with the defendant's subjective state of mind. The first component requires the plaintiff to raise, through competent summary judgment materials, a genuine issue of fact as to what the settled law was at the time of the defendant's conduct, and whether the defendant knew or should have known that his conduct was not in conformity with that settled law. Of course, there are no bright lines for deciding whether the law's treatment of particular conduct at any given time was "settled," and neither are there bright lines for deciding whether an official should have known under settled law that his conduct violated the plaintiff's constitutional rights.

 Although the second component of the good faith issue depends on the defendant's subjective state of mind, it does not necessarily follow that there is always a genuine issue of fact as to the presence or absence of malicious intent to harm the plaintiff. The only direct evidence of a person's state of mind, of course, can come from that person's statements—whether made on or off the witness stand, and whether made before, during, or after committing the complained-of conduct. But a defendant's state of mind may also be proved circumstantially through objective evidence. Indeed, factfinders can and frequently do reject on credibility grounds the only direct evidence of a person's state of mind (*i. e.*, his own statements) in favor of compelling contrary inferences that the factfinder has drawn from the surrounding objective circumstances.

 As to this second component of the "good faith" issue, it is the plaintiff's burden to raise a triable issue of fact as to the defendant's malicious intent once the defendant has established that he is entitled to claim official immunity because the complained-of conduct was undertaken pursuant to his discretionary authority. As a practical matter, the plaintiff may meet his burden of raising a triable issue of fact as to the defendant's malicious intent in either of two ways: he may introduce competent summary judgment materials, or point to summary judgment materials already in the record, that would tend to prove *directly* that the defendant acted with subjective malice)[21] or, he may introduce competent summary judgment materials, or point to summary judgment materials already in the record, that would tend *circumstantially* to prove that the defendant acted with malicious intent.[22]

---

**21.** Relatively direct evidence of the defendant's state of mind might consist, for example, of statements by the defendant to others that he was "out to get" the plaintiff, or that he disliked or disapproved of the plaintiff. Other such evidence might take the form of hostile spontaneous utterances by the defendant as he committed the complained-of conduct. Obviously, however, in a great many cases such evidence will simply not be available.

**22.** Indirect evidence that would support circumstantially the inference that the defendant harbored malice toward the plaintiff will vary with the circumstances surrounding different types of claims. In a police or prison guard brutality case, for example, the severity of a plaintiff's physical injuries might raise such an inference. Or, for example, such an inference might arise from evidence that the defendant was prejudiced against persons of the plaintiff's sex, race, religion, etc. Evidence of motive might also give rise to an inference of malice—for example, if the plaintiff and the defendant had had unpleasant dealings in the past, or if the plaintiff had done something to the defendant that might have prompted malicious retaliation.

■ If the plaintiff can point to *nothing* other than his own subjective belief that the defendant intended him harm—if fails to articulate *any* objective circumstances that could serve as a rational basis from which a factfinder could infer that the defendant acted out of malice rather than duty—then the plaintiff has not raised a triable issue of fact as to the defendant's malicious intent, and summary judgment is proper. "[I]f there is 'a complete absence of probative facts' to support a particular inference, or, if 'the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at [but one] verdict,' the court may bypass the jury." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978) (second bracketed portion by *Nunez* court; cite omitted) (reviewing grant of summary judgment on issue that involved defendant's state of mind). "[E]vidence purporting to create doubts as to the facts that is too incredible to be accepted by reasonable minds will not prevent summary judgment." 10 C. Wright & A. Miller, Federal Practice and Procedure § 2727, at 551 (1973). Short of this extreme, however, may summary judgment properly be granted on a state of mind issue?

A number of cases, including some from the Supreme Court and from this circuit, have affirmed grants of summary judgment in section 1983 actions without discussing in any detail the problem of when summary judgment can be granted on an issue or claim that involves state of mind.[23] Other cases, however, express grave doubts about the appropriateness of resolving such questions through summary judgment.[24] In the case at bar, we need not attempt to provide a definitive solution to this problem: as explained below in part IV–*B–1* of this opinion, the objective circumstances upon which Barker relies could easily allow a factfinder to infer that Officer Norman acted with malicious intent, and, given other circumstances present in the case, summary judgment on that issue therefore was improper.

## IV. APPLICATION OF THE LAW TO THE FACTS OF THIS CASE

### A. Officer Norman's Failure to Plead Qualified Immunity

■ As we noted above in part III–*A–1* of this opinion, qualified immunity is an affirmative defense that must be pleaded by the defendant who seeks its protections. And, as we noted above in part I–*B* of this opinion, in none of his pleadings does Officer Norman assert that he is entitled to claim qualified immunity from liability under section 1983. Yet this was the ground upon which the district court granted summary judgment in his favor.

Nonetheless, Barker's postjudgment motions in the district court did not protest the

Obviously, it is impossible to catalog the objective circumstances that could support an inference of malice; the examples listed herein are by no means exhaustive.

23. E. g., *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Benson v. Hightower*, 633 F.2d 869 (9th Cir. 1980), pet'n for cert. filed, 49 U.S.L.W. 3840 (May 12, 1981) (no. 80–1811); *Walters v. City of Ocean Springs*, 626 F.2d 1317 (5th Cir. 1980); *Henzel v. Gerstein*, 608 F.2d 654 (5th Cir. 1980); *White v. Boyle*, 538 F.2d 1077 (4th Cir. 1976); *Tritsis v. Backer*, 501 F.2d 1021 (7th Cir. 1974).

24. *Compare Maiorana v. MacDonald*, 596 F.2d 1072, 1076–81 (1st Cir. 1979) (affirming grant of summary judgment because even ignoring procedural defects in plaintiff's controverting materials, there was no genuine issue of fact as to defendants' lack of malice), *with Butz v. Economou*, 438 U.S. at 527, 98 S.Ct. at 2921 (Rehnquist, J., dissenting from the majority's

holding that the defendant federal official was entitled to only qualified, rather than absolute, immunity, in part on grounds that summary judgment is an inappropriate means for determining factual issues involving state of mind); *Hardin v. Pitney-Bowes, Inc.*, —— U.S. ——, 101 S.Ct. 2345, 68 L.Ed.2d 861 (1981) (Rehnquist, J., dissenting from denial of certiorari on grounds that court of appeals had erroneously affirmed the grant of summary judgment in a case turning upon state of mind). *Cf. Rebozo v. Washington Post Co.*, 637 F.2d 375, 380–82 (5th Cir. 1981) (discussing summary judgment on issue of "actual malice" in the context of a defamation suit); *Nunez v. Superior Oil Co., supra* (discussing summary judgment on good faith in failure to pay delay rentals on oil and gas lease); 10 C. Wright & A. Miller, *supra*, § 2730, at 590–600 (discussing summary judgment on state of mind issues generally).

district court's action in supplying *sua sponte* the qualified immunity defense for Officer Norman; neither did Barker claim surprise or prejudice from Officer Norman's failure to plead that defense. In fact, Barker has not argued on appeal that Officer Norman waived his qualified immunity defense by failing to plead or argue it. Instead, Barker confines his argument to the question of whether there remained a genuine issue of material fact that would preclude summary judgment under Rule 56. Accordingly, we deem Barker to have waived whatever arguments he might have made to the effect that summary judgment in Officer Norman's behalf was improper because Officer Norman had not pleaded qualified immunity.

## B. The Search and Seizure Claims

 *1. Officer Norman, the apartment search, and the property seizure.*—Officer Norman's summary judgment motion basically argues that there was no violation of Barker's Fourth Amendment rights in the search of his apartment and the seizure of various items therein: Officer Norman contends that Keller's consent legitimated the search, and that her description of the seized items as having been stolen gave him probable cause to believe that the items were, in fact, stolen property. Barker vigorously denied that Keller either consented or described the items as stolen; yet Barker's own summary judgment materials demonstrate that he has no personal knowledge of the encounter at the apartment, since he was not present, and the purported statements of Keller that he incorporated in his own affidavits and verified pleadings are incompetent as hearsay under Rule 56(e). Under normal circumstances, therefore, we would be bound to accept as true Officer Norman's version of the events that surrounded the apartment search and the property seizure.

In the case at bar, however, Barker's allegations in his attempt to controvert Officer Norman's summary judgment motion were specific and nonconclusory. If he had introduced a properly verified affidavit *from Keller* that contained the same factual allegations, such an affidavit certainly would have been sufficient to raise a genuine issue of material fact as to whether Keller consented to the apartment search and as to whether she identified items inside the apartment as being stolen property.[25] If she did not consent to the search or identify items as stolen property, that in turn would raise a genuine issue of fact as to whether Officer Norman acted with malice and whether he knew or should have known that he was violating Barker's clearly established constitutional rights. Further, after the court rendered summary judgment against him, Barker filed a post-judgment motion for reconsideration that included a transcription of a telephone conversation he allegedly had with Keller in which she reconfirmed her version of the events surrounding the apartment search and property seizure. Even though Barker himself verified this transcription, it is incompetent hearsay in its present form; nonetheless, it is quite conceivable that Barker's crude summary judgment materials accurately reflect Keller's version of events. If that be so, then Barker may well have a meritorious claim on this cause of action.

As we said in *Gordon v. Watson*, quoted above in part III–B–1 of this opinion, "[w]hen summary judgment is inappropriate because the supporting *or opposing* materials are improper, the district court has ample discretion to call upon the parties to remedy the defects, by submitting affidavits or otherwise." 622 F.2d at 123 (emphasis added). Given the precise factual circumstances of this case, we believe that the district court abused its discretion in failing to afford Barker a meaningful opportunity

---

**25.** Although it is not clear from the record exactly what part Barker's mother played in the events surrounding the apartment search and the property seizure, it may well be that she would be competent to testify to at least some of those events from her personal knowledge; if so, a properly verified affidavit by her might raise a genuine issue of material fact as to some or all of those events.

to remedy the obvious defects in his summary judgment materials.[26]

Accordingly, we hold that with regard to three issues in the apartment search and property seizure causes of action against Officer Norman—whether Officer Norman engaged in the conduct complained of by Barker, whether that conduct violated Barker's constitutional rights, and whether Officer Norman's official immunity should be breached because he either harbored a subjective intent to harm Barker or knew or should have known that his conduct violated Barker's clearly established constitutional rights—the district court's abuse of its discretion in failing to afford Barker a meaningful opportunity to remedy the defects in his summary judgment materials means that its judgment must be reversed. Barker must be given the opportunity to raise a genuine issue of fact as to these questions through materials competent under Rule 56(e). We intimate no views as to whether summary judgment would be appropriate on one or more of these issues if, on remand, Barker fails to present competent controverting materials; however, we reiterate our assertion in *Gordon v. Watson*, 622 F.2d at 123, that in the final analysis "we have never allowed [pro se litigants successfully] to oppose summary judgment by the use of unsworn [or incompetent] materials."

However, with regard to another issue—whether Officer Norman is entitled to claim a qualified official immunity because he was acting within the scope of his discretionary authority—the district court did not abuse its discretion in failing to afford Barker an opportunity to remedy the defects in his summary judgment materials. Officer Norman's summary judgment materials are sufficient to establish that his actions, even under Barker's version of events, were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority. Keller's version of events, as related by Barker, has nothing to do with whether Officer Norman was entitled to *claim* official immunity (*i. e.*, whether he was acting within the scope of his discretionary authority as a police officer). Neither in the district court nor on appeal has Barker suggested any objective circumstances that would tend to controvert Officer Norman's demonstration in his summary judgment materials that whatever his actions may have been, they were undertaken as an exercise of the discretion accorded him in the performance of his duties as a police detective. There being no genuine issue of fact as to whether Officer Norman's actions were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority, the district court's grant of summary judgment with respect to this issue is affirmed.

The burden is now on Barker to raise a genuine issue of fact as to whether Officer Norman's qualified official immunity from section 1983 liability on the apartment search and property seizure claims should be breached; if he fails to do so, these claims will be foreclosed by that immunity, regardless of the existence of disputed

26. Such an opportunity could well be afforded through the court's comments in the context of a hearing in which the court receives oral argument on a summary judgment motion; a district judge, however, is neither required nor permitted to become counsel for any party, whether that party is appearing pro se or through counsel, and the precise nature of the opportunity given a pro se litigant to remedy defects in his summary judgment materials lies, of course, in the sound discretion of the district court.

Cf. *Hudson v. Hardy*, 412 F.2d 1091, 1094 (D.C. Cir. 1968) ("[B]efore entering summary judgment against [a pro se litigant], the District Court, as a bare minimum, should [provide]

him with fair notice of the requirements of the summary judgment rule. We stress the need for a form of notice sufficiently understandable to one in [the pro se litigant's] circumstances fairly to apprise him of what is required."); *accord, Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1978). *See also Whitaker v. Coleman*, 115 F.2d 305, 307 (5th Cir. 1940) ("Summary judgment is not a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial . . . ."); *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967) ("Summary judgment is a lethal weapon and courts must be mindful of its aims and targets and beware of overkill in its use.").

questions of fact as to whether the complained-of conduct occurred, or of disputed legal questions as to whether that conduct violated rights secured to Barker by the Constitution or laws of the United States.

■ *2. Agent Ballas, the apartment search, and the property seizure.*—Agent Ballas' affidavits in support of his summary judgment motion clearly establish that he had no prior or contemporaneous knowledge of the apartment search in Houston. He has established that there is no genuine issue of fact as to whether he participated in, encouraged, or conspired to commit the apartment search. The same is true as to the seizure of the car and the items from the apartment. Barker introduced no controverting summary judgment materials, competent or incompetent. Neither has he suggested on appeal that any evidence exists that might controvert Agent Ballas' affidavits. Accordingly, on the existing record, summary judgment in Agent Ballas' favor was appropriate on the search and seizure causes of action—not on qualified immunity grounds, but because there was no genuine issue of fact as to whether he engaged in the complained-of conduct. The rationale used by the district court, if not the labels it applied to its conclusions, strongly suggest that this was in fact the basis for its decision, and we affirm on that ground.

*C. The Coerced Plea Claim*

■ Barker alleges that the combined actions of Agent Ballas, Officer Norman, and AUSA Miller operated to coerce him into entering a guilty plea to the Kansas firearms violation. This appears to be precisely the same argument that he urged—with no success—in trying to withdraw his guilty plea. *See Barker v. United States,* 579 F.2d 1219 (10th Cir. 1978). Collateral estoppel may in some circumstances bar civil rights claims whose central issues have been determined in a prior criminal proceeding. *See Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *compare Martin v. Delcambre,* 578 F.2d 1164 (5th Cir. 1978), *with Courtney v. Reeves,* 635 F.2d 326, 329 (5th Cir. 1981).

That doctrine, however, is an affirmative defense that must be pleaded by the defendant who seeks to assert it. *See generally* 10 C. Wright & A. Miller, Federal Practice and Procedure § 2735 (1973). Agent Ballas and Officer Norman have not yet pleaded collateral estoppel; neither have they urged it as a ground for summary judgment, and the district court did not base its decision on that ground. We therefore do not consider it in reviewing the grant of summary judgment on the coerced plea cause of action.

■ The first—and dispositive—question is whether there is a genuine issue of fact as to whether the two defendants engaged in the complained-of conduct. The only arguable support in the record for Barker's bald allegation that the defendants conspired to coerce him into pleading guilty is that portion of Barker's verified complaint wherein he purports to quote what he says was an affidavit given by Keller in the Kansas plea withdrawal hearing. Even were this purported quotation from an affidavit competent for Rule 56 purposes—which it is not, being hearsay—we do not believe that this, standing alone, would be sufficient to raise a genuine issue of fact as to whether the defendants engaged in the alleged conspiracy. Even if all the facts suggested by Barker were adduced by affidavit or deposition, they would show no more than that Officer Norman and Agent Ballas cooperated with AUSA Miller to build the strongest possible case against Barker. There is no suggestion of any evidentiary material by which Barker might prove that Officer Norman or Agent Ballas engaged in the complained-of conduct—*i. e.,* a conspiracy to overcome Barker's free will and to deprive Barker of a fair trial by coercing him to plead guilty. Barker's pleadings and summary judgment materials, whether competent for Rule 56(e) purposes or not, are insufficient to raise a fact issue on this claim because they contain nothing more than "bare allegations that all of the defendants 'conspired' to deprive him of his constitutional rights," *Henzel v. Gerstein,* 608 F.2d 654, 659 (5th Cir. 1980).

In these circumstances and on this record, there is no genuine issue of material fact as to whether either defendant had engaged in the complained-of conduct. Accordingly, we affirm the grant of summary judgment in favor of both defendants on this cause of action, though not on grounds of qualified immunity.

### D. The Property Retention Claim

 *1. Officer Norman and the property retention claim.*—Our case law indicates that continued retention by police officers of allegedly stolen property, as distinct from the initial seizure of that property, may in some circumstances be a constitutional deprivation. *See Reimer v. Short,* 578 F.2d 621, 628–29 (5th Cir. 1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1425, 59 L.Ed.2d 635 (1979); *Clayton v. Shaw,* 548 F.2d 1155 (5th Cir.), *cert. denied,* 434 U.S. 873, 98 S.Ct. 220, 54 L.Ed.2d 153 (1977); *Snell v. Short,* 544 F.2d 1289, 1291 (5th Cir. 1977). Officer Norman did not argue in the district court that summary judgment should be granted because the retention of the property seized from the apartment was not a violation of Barker's constitutional rights; indeed, neither he nor the district court distinguished this cause of action from that arising from the original seizure. Obviously, it is one thing to say that Officer Norman was justified in seizing the property in the first place, and entirely another to say that he was justified in retaining it under the possibly different set of circumstances that existed when and if it became clear that the property was not going to be used as evidence against Barker and Barker demanded its return.

Officer Norman admits in his answers to Barker's requests for admissions that he still has possession of some of the property that was seized from Barker's apartment. As is also true with the cause of action for the initial seizure, there is some discrepancy between the property listed by Barker as having been unlawfully retained and that which Officer Norman admits to retaining. Moreover, there is a genuine issue of fact as to whether Barker has ever demanded the property's return: Barker asserts in his verified complaint that Officer Norman has refused to return the property; yet the implication of Officer Norman's affidavit and answers to requests for admissions is that Officer Norman has offered to return the property, but Barker never demanded its return and in fact told Officer Norman that he did not care to get the property back. Summary judgment, therefore, could not properly have been granted on this record on the ground that there was no genuine issue as to whether Officer Norman engaged in the complained-of conduct.

Further, if Barker's version of the facts is correct, as must be assumed at this stage because those facts are genuinely disputed, it is by no means obvious that Officer Norman's conduct has not infringed Barker's civil rights.[27]

 With regard to Officer Norman's entitlement to claim official immunity from section 1983 liability on this cause of action, the sole justification he has proffered for keeping the property is that he believes it to have been stolen. Other than this asser-

---

27. Arguments to that effect could be made, however. For example, an argument could be made that there is no denial of due process for an officer to retain property alleged to have been stolen until after the claimant has availed himself of the mechanisms provided by state law to establish his entitlement to the property. *See* Tex.Code Crim.Pro. Ann. art. 47.01 (Vernon 1979).

We express no opinion on the matter, but such an argument is, of course, available to Officer Norman on remand. *Cf. Parratt v. Taylor,* — U.S. ——, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (defendant prison officials' negligent loss of prisoner's hobby materials not actiona-

ble under § 1983 because although prisoner was deprived of property under color of state law, deprivation was not without due process of law: the loss was not due to faulty prison procedures, and state law provided a process by which the prisoner could obtain redress after the fact); *Jonas v. City of Atlanta,* 647 F.2d 580, 585 (5th Cir. 1981) [slip op. 7895, 7901–02] (defendant police officers lacked authority to detain seized car because they failed to comply with forfeiture proceedings created by state law; therefore, they were not insulated from § 1983 liability on grounds that they had not violated any of the plaintiffs' rights).

tion, he has established no objective circumstances from which one could conclude that his retention of the property was undertaken pursuant to the performance of his duties and within the scope of his authority. We note that a policeman's duties in these circumstances are somewhat analogous to those of a jailer or custodian; because there is less discretion inherent in these duties, under *Douthit* and the other cases discussed above in part III–*A*–*1* of this opinion, the showing that Officer Norman must make to establish his entitlement to claim immunity is higher for this cause of action than for the apartment search or initial property seizure. We conclude that Officer Norman has not established his entitlement to claim official immunity from liability for this cause of action; this pretermits the second half of qualified immunity analysis, which has to do with Officer Norman's good faith. Summary judgment in Officer Norman's favor on this claim was improper on this record.

■ *2. Agent Ballas and the property retention claim.*—As is true with the apartment search and property seizure causes of action, see part IV–*B*–*2* of this opinion, *supra*, Agent Ballas' summary judgment materials establish that there is no genuine issue of fact as to whether he has had any knowledge of or involvement in the retention by Officer Norman of the property seized from Barker's apartment. Barker introduced no controverting summary judgment material, competent or incompetent, and has not even suggested the possible existence of such material. Summary judgment in Agent Ballas' favor on this cause of action was, therefore, appropriate on the ground that there was no genuine issue of fact as to whether he had engaged in the complained-of conduct. We affirm on that ground.

## V. CONCLUSION

In conclusion, we affirm on other grounds the district court's judgment insofar as it grants summary judgment in Agent Ballas' favor on all causes of action. We affirm on other grounds the district court's judgment

insofar as it grants summary judgment in Officer Norman's favor on the coerced plea cause of action. We affirm the judgment insofar as it holds that Officer Norman has established his entitlement to claim a qualified official immunity with respect to the apartment search and property seizure causes of action; however, we reverse the judgment on those two causes of action insofar as it holds that there is no genuine issue of fact as to (1) whether Officer Norman engaged in the complained-of conduct, (2) whether that conduct violated Barker's constitutional rights, and (3) whether Officer Norman's official immunity should be breached because he either harbored a subjective intent to harm Barker or knew or should have known that he was violating Barker's clearly established constitutional rights. We reverse the judgment in all respects insofar as it grants summary judgment in favor of Officer Norman on the property retention cause of action. We remand for further proceedings consistent with this opinion on those claims and issues as to which we reverse. We of course express no views as to the merits of the claims as to which we are remanding; neither do we intend to foreclose the possibility that summary judgment may be proper on all or part of the issues in each of these claims upon a better-developed record.

AFFIRMED IN PART; REVERSED IN PART and REMANDED.

GEE, Circuit Judge, concurring in part and dissenting in part:

Though I have struggled to concur fully in the court's admirable and useful opinion, in the end I find myself at odds with one of its holdings, and one only: that the trial judge abused his discretion in failing to counsel Barker that his affidavit in opposition to motion for summary judgment was insufficient because it advanced only hearsay on dispositive points, Keller's consent to the search of Barker's apartment and her description of items confiscated there as stolen. Had Barker been represented by counsel, and had this fault in his presentation appeared, I venture that the judgment

against him would have been affirmed. Implicitly or explicitly, we would have assumed that counsel offered hearsay because he had nothing better to offer: could not locate the witness, could not procure her affidavit to the desired effect, whatever.

I respect the generous impulse that prompts my siblings to grant Barker special indulgence as a pro se litigant and, as such a one, unfamiliar with the law of evidence. Nor do I doubt that justice in the case is served thereby; it is. Well and very well, for the short run. But the run of justice *according to law* is a long one, and I doubt that it is well served by offering incentives to pro se litigation. Nor do I see how, once the judge is cast in the role of counsel for the pro se litigant in one respect and reversed for failing to ascertain that role and embrace it, we can easily cut steps in the slippery slope onto which we have advanced.[1] When hearsay is testified to in a trial pro se, for example, must the judge henceforth exclude it, absent an objection, on pain of reversal?

Pro se litigation is a necessary accommodation to constitutional demands and to those of fairness were there no constitution. As such, it must be countenanced. But to encourage it, in a time when few causes of arguable merit, and some of little or none, want a trained champion by writing special rules favoring it seems to me unwise. Pro se litigants seldom fail to advise us of their ignorance of the law and their corresponding need for special indulgence; the claim is a familiar introduction to prisoners' pro se civil rights complaints and petitions for habeas. To his credit, Barker did not do so, but he has received it at our hands even so. The role of Scrooge is one that I assume unhappily, but once we begin to confect a general set of rules more favorable to those who proceed without counsel than to those who do, I know of no principled way to stop. I would not begin. To this small degree, I dissent. As to the remainder of the court's disposition, I gladly concur.

1. Had the trial judge volunteered his counsel, I would not be concerned. It is placing him in error because he did not that troubles me.